315 Ga. 319
FINAL COPY

S22A1099. STATE OF GEORGIA et al. v. FEDERAL DEFENDER
PROGRAM, INC. et al.

McMILLIAN, Justice.

After an order was issued setting the execution of Virgil Delano Presnell, Jr., the Federal Defender Program, Inc. ("Federal Defender"),[1] filed a breach of contract action against the State of Georgia and Christopher M. Carr in his official capacity as Attorney General (collectively, the "State") alleging that the State breached a contract governing the resumption of the execution of death sentences in Georgia after the COVID-19 pandemic. The State contends that the trial court erred in denying its motion to dismiss based on sovereign immunity and in granting the Appellees'

---

[1] The Federal Defender is a domestic nonprofit corporation whose Capital Habeas Unit represents death row inmates in post-conviction proceedings in the federal courts and in clemency proceedings before the State Board of Pardons and Paroles. Presnell later joined the lawsuit; we refer to the Federal Defender and Presnell collectively as "Appellees."

emergency motion for a temporary restraining order and an interlocutory injunction.[2] As explained below, we conclude that an e-mail exchange between a deputy attorney general and certain capital defense attorneys, including an attorney employed by the Federal Defender, constituted a written contract sufficient to waive sovereign immunity in this matter, and we in turn conclude that the trial court did not abuse its discretion in weighing the equities in granting the Appellees' motion for injunctive relief. Accordingly, we affirm.

1. *Background.* "The grant or denial of an interlocutory injunction rests in the sound discretion of the trial court. However, where there is no conflict in the evidence, the judge's discretion in granting or denying the interlocutory injunction becomes circumscribed by the applicable rules of law." *Shiva Mgmt., LLC v. Walker*, 283 Ga. 338, 340 (658 SE2d 762) (2008) (citation and punctuation omitted). In this case, the relevant facts as developed

---

[2] The Court thanks the Southern Center for Human Rights for its amicus curiae brief.

at the evidentiary hearing on the State's motion to dismiss on sovereign immunity grounds and the Appellees' motion for interlocutory injunction are uncontested and show the following.

On May 14, 2020, then-Chief Justice Harold Melton created the Judicial COVID-19 Task Force ("Task Force") to advise the Judicial Council of Georgia and this Court regarding the implementation of measures to address the challenges facing the courts and affected parties as a result of the COVID-19 pandemic. The Task Force created several sub-committees, including the Criminal Committee ("Sub-Committee"), whose purpose was to focus on issues related to COVID-19's effect on the criminal justice system in Georgia. In the fall of 2020, in response to an invitation from the Task Force, the Georgia Association of Criminal Defense Lawyers ("GACDL") prepared draft legislation to address the capital defense bar's concerns about how the restrictions necessitated by COVID-19 had resulted in a backlog of execution-eligible inmates. This backlog not only hindered capital defense counsel's ability to prioritize clemency investigations for the growing number of inmates eligible for

3

execution but also impaired counsel's ability to meet with their clients and conduct investigations in order to prepare for clemency proceedings and adequately represent their clients.

On February 4, 2021, Anna Arceneaux, the Executive Director of the Georgia Appellate Practice & Educational Resource Center ("Georgia Resource Center"), and Sabrina Graham, a Senior Assistant Attorney General and the Chief of the Capital Litigation Section of the Attorney General's Criminal Justice Division, each addressed the Sub-Committee during its meeting at which the GACDL's proposed legislation was discussed. In response, Sub-Committee members asked that, instead of pursuing legislation, Arceneaux and Graham work together to reach an agreement regarding the orderly management of the cases of execution-eligible inmates. Arceneaux and Graham agreed to do so and to report back to the Sub-Committee. On February 10, 2021, Arceneaux, together with Jill Benton, the Supervising Attorney for the Federal

Defender's Capital Habeas Unit, and David DeBruin,[3] a private attorney who represents death row inmate Billy Raulerson, met via video conference with Graham and Beth Burton, the Deputy Attorney General of the Criminal Justice Division, to discuss the terms of an agreement that they could present to the Task Force. Two days later, Arceneaux sent an e-mail to Burton and Graham with a proposed "Memorandum of Understanding" ("MOU") that was based on the parties' discussions at that video conference. After discussing the proposed MOU with Arceneaux multiple times during the next two months, Graham called Arceneaux on April 14, 2021, to tell her that she would be receiving an e-mail from Burton memorializing the terms of the agreement.

Shortly after Graham's call, Arceneaux received an e-mail from Burton that began with the following:

> Anna, instead of a formal MOU, we will agree, and this email serves as the agreement, that:

---

[3] The group of attorneys involved in the negotiations included counsel for all of the inmates who became execution-eligible during the time period covered by the "Order Declaring Statewide Judicial Emergency," which was issued by then-Chief Justice Melton on March 14, 2020, and which, after 15 extensions, expired on June 30, 2021.

Our office will not pursue an execution warrant from the District Attorney in the below defined cases before: 1) the final COVID19 judicial emergency order entered by the Chief Justice of the Supreme Court of Georgia expires; 2) the Georgia Department of Corrections lifts its suspension of legal visitation, and normal visitation resumes; and [3]] a vaccination against COVID19 is readily available to all members of the public.

Burton's e-mail further stated that the "agreement applie[d] only to death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order" and that, with one named exception,[4] the Attorney General's office agreed "not [to]

---

[4] The named exception was Billy Raulerson. According to the record, during the time period in which the COVID-19 judicial emergency order was in effect, the United States Supreme Court denied ten Georgia death row inmates' petitions for certiorari from the denial of their federal habeas petitions; therefore, the appeals of these ten inmates were exhausted, and the inmates became execution-eligible. However, the Agreement "applie[d] only to death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order," and two of the ten inmates who became execution-eligible during the judicial emergency, Raulerson and Michael Nance, were not in this group, because their petitions for rehearing en banc in the Eleventh Circuit were denied *before* the judicial emergency order went into effect. Nevertheless, the Agreement included special terms specific to Raulerson and Nance regarding when the Attorney General's office would seek execution orders in their cases.

The provision regarding Nance's case is not relevant to this appeal. With

6

pursue an execution warrant of any prisoner . . . before a total of at least six months after the time the above-three conditions [we]re met." Burton's e-mail concluded by stating that the agreement was "made with the understanding that the District Attorney maintain[ed] the sole authority to obtain an execution warrant."

Arceneaux replied to the e-mail, adding Benton and DeBruin as addressees, and she informed Burton and Graham that she had let the GACDL know about the agreement so that the GACDL could share it with the Task Force at the meeting taking place that afternoon. In the same e-mail thread, both Benton and DeBruin responded seeking a similar clarification regarding the agreement, and Graham replied that they had the correct understanding with respect to the timing of the execution orders, stating: "Yes, we

---

regard to Raulerson, the Agreement provided that, after the three conditions were met, "and no earlier than August 1, 2021, [the Attorney General's] office intend[ed] to request an execution warrant for [Raulerson and would] provide Raulerson's counsel with notice of at least three months after the three-above conditions [we]re met before pursuing an execution warrant." The record shows that, when the Attorney General's office started the process of reinitiating executions, the office worked first toward obtaining an execution order for Raulerson but then changed course and sought an execution order for Presnell due to Raulerson's counsel's "previously noticed plans to be out of the country" from May 11 to May 22, 2022.

confirm that's the agreement." (This April 14, 2021 e-mail exchange is hereinafter referred to as "the Agreement.")

Over a year later, on April 27, 2022, the Superior Court of Cobb County entered an order for the execution of Presnell, setting a window for that execution of noon on May 17 to noon on May 24, 2022, and the Department of Corrections ("DOC") scheduled the execution for May 17 at 7:00 p.m. See OCGA § 17-10-40 (establishing the procedure for scheduling executions). In response, on May 9, 2022, the Federal Defender filed on its own behalf a complaint against the State alleging a breach of the Agreement and seeking a temporary restraining order and an interlocutory injunction in order to halt Presnell's scheduled execution and to foreclose the scheduling of executions for the other inmates covered by the Agreement. On May 13, 2022, Presnell, represented by the Federal Defender, filed a motion to intervene as a plaintiff, which the trial court orally granted at a hearing on May 16, 2022.

At the hearing, the Appellees conceded that the first condition — the expiration of the final COVID-19 judicial emergency order —

8

had been satisfied, but they contended that the second and third conditions had not yet been satisfied. As to the second condition, the Appellees asserted that the DOC still maintained a "Modified Visitation" policy that placed numerous restrictions on both normal visitation and legal visitation and that differed materially from the DOC's pre-pandemic visitation policies. The Appellees contended that these restrictions seriously impaired the ability of capital defenders, including lawyers at the Federal Defender, to effectively represent their clients in clemency and other pre-execution proceedings. As to the third condition, the Appellees argued that the condition regarding the availability of a COVID-19 vaccine had not been satisfied, because children under the age of five years were not eligible to receive the vaccination at that time. As a result, (1) the DOC prohibited visitors under the age of five years from entering state prisons, and execution-eligible inmates were prevented from visiting affected family members, and (2) capital defenders with children in this age group were hindered in representing their clients for fear of transmitting the virus to their children. Finally,

the Appellees contended that the State breached the Agreement by giving the Federal Defender, as counsel for Presnell, only two days' notice of its intent to pursue an execution order in his case, instead of waiting until six months after the three conditions had been met before seeking such an order.[5]

Accordingly, the Appellees urged the trial court to enter a temporary restraining order and an interlocutory injunction prohibiting the State, along with anyone acting in active participation or concert with it, from pursuing an execution order for eligible prisoners who are subject to the Agreement and from taking any action in furtherance of any previously issued execution order that is subject to the Agreement, including the order issued with respect to Presnell, until six months after (1) the DOC returned to "normal visitation" and (2) a COVID-19 vaccine became readily available to "all members of the public." The State, in turn, urged the trial court to dismiss the complaint based on sovereign immunity

---

[5] At the hearing, while the Appellees presented testimony and other evidence to support their contentions, the State elected not to present any witnesses or to cross-examine any of the Appellees' witnesses.

and argued that, in any event, a consideration of the relevant factors did not support a temporary restraining order or an interlocutory injunction.

At the hearing on May 16, 2022, the trial court orally denied the State's motion to dismiss based on sovereign immunity, after concluding that the Agreement constituted a valid written contract, and orally granted the Appellees' motion for a temporary restraining order and an interlocutory injunction. The trial court entered written orders the following day, May 17, 2022. The temporary restraining order issued by the trial court was to be in effect for only 30 days, and it therefore is no longer at issue in this appeal. The trial court's interlocutory injunction "applies until a final judgment in th[e] case or six months have passed after (1) the [DOC] lifts all Covid-19 restrictions on visitation and restores normal visitation procedures and (2) a Covid-19 vaccine is available to all members of the public." As a result of the trial court's grant of injunctive relief,

Presnell's execution was effectively stayed. This appeal followed.[6]

2. *This Court's Jurisdiction.* Although no party has questioned our jurisdiction in this appeal, "it is our duty to inquire into our jurisdiction 'in any case in which there may be a doubt about the existence of such jurisdiction.'" *Brock v. Hardman*, 303 Ga. 729, 729 (1) (814 SE2d 736) (2018) (citation omitted). For the reasons that follow, we conclude that we do have jurisdiction in this case.

Since 2017, the Georgia Code has provided that the Court of Appeals rather than this Court has appellate jurisdiction in "[a]ll equity cases, except those cases concerning proceedings in which a

---

[6] On May 17, 2022, the State filed in this Court an "Emergency Appeal, and in the Alternative, Emergency Application for Discretionary Appeal," which was docketed as Case No. S22W1021. The State did not seek a supersedeas from the trial court or from this Court, however, and the temporary restraining order and interlocutory injunction remained in place while the execution order in Presnell's case expired. See OCGA § 9-11-62 (a); *Brown v. Spann*, 271 Ga. 495, 496 (520 SE2d 909) (1999) ("[T]he filing of a notice of appeal in injunction cases does not serve as a supersedeas."). On May 23, 2022, this Court received and docketed the record in the matter, which included a notice of appeal that the State had filed on May 17, 2022, stating that it was appealing from the judgment denying its motion to dismiss and granting a temporary restraining order and an interlocutory injunction. On June 7, 2022, this Court struck Case No. S22W1021 from its docket and re-docketed the notice of appeal previously docketed under that case number as a direct appeal under Case No. S22A1099.

12

sentence of death was imposed or could be imposed and those cases concerning the execution of a sentence of death[,]" which are reserved to this Court. OCGA § 15-3-3.1 (a) (2) (enacted by Ga. L. 2016, pp. 883, 892, § 6-1 (c)). In this case, the State claims that the trial court abused its discretion in granting the Appellees' request for an interlocutory injunction concerning the timing for seeking orders for the execution of specified death sentences from the superior courts of the counties where those sentences were originally imposed. See OCGA § 17-10-40 (a) (providing the procedure for execution orders). Therefore, this case is both a case "concerning proceedings in which a sentence of death was imposed" and a case "concerning the execution of a sentence of death." OCGA § 15-3-3.1 (a) (2). See *Brock*, 303 Ga. at 730-31 (1) (considering identical exception language in OCGA § 15-3-3.1 (a) (4) to hold that "a mandamus petition brought by a prisoner convicted of murder claiming a right to free records of his murder case for the purpose of challenging that conviction is a case 'concerning (the) proceedings' in which a sentence of death could have been imposed" and,

13

therefore, that this Court has jurisdiction in such cases).

As to whether this action is an equity case for the purpose of determining jurisdiction on appeal as opposed to a breach of contract case, that question "depends upon the *issue* raised on appeal, not upon how the case is styled nor upon the kinds of relief which may be sought by the complaint." *Beauchamp v. Knight*, 261 Ga. 608, 609 (2) (409 SE2d 208) (1991) (emphasis in original), disapproved on other grounds by *Gilliam v. State*, 312 Ga. 60, 63-64 (860 SE2d 543) (2021). In other words, "'equity cases' are those in which a substantive issue on appeal involves the legality or propriety of equitable relief sought in the superior court — whether that relief was granted or denied." Id. However, "[c]ases in which the grant or denial of such relief was merely ancillary to underlying issues of law, or would have been a matter of routine once the underlying issues of law were resolved, are not 'equity cases.'" Id. See also *Saxton v. Coastal Dialysis & Med. Clinic, Inc.*, 267 Ga. 177, 179 (476 SE2d 587) (1996) (explaining that the case was "not an 'equity' case" for purposes of determining general appellate jurisdiction, because the

grant of equitable relief in the form of an injunction "was merely ancillary to the underlying legal issue of whether the trial court properly construed [the appellant]'s non-competition covenant"). In short, for a matter to come within the framework of an equity case, "the lower court must have rendered a judgment based upon equitable principles, and that decision must be the primary issue on appeal." *Warren v. Bd. of Regents of the Univ. System of Ga.*, 272 Ga. 142, 145 (527 SE2d 563) (2000). This is just such a case.

Here, the primary issue on appeal is the trial court's decision regarding the Appellees' request for an interlocutory injunction. As the discussion below in Division 4 shows, the trial court balanced the relative equities and determined that an interlocutory injunction should issue "to preserve or restore the status quo and keep the parties from injuring one another until the court has had a chance to try the case." *Bishop v. Patton*, 288 Ga. 600, 604 (3) (a) (706 SE2d 634) (2011), disapproved on other grounds by *SRB Investment Svcs., LLLP v. Branch Banking & Trust Co.*, 289 Ga. 1, 5 (3) n.7 (709 SE2d 267) (2011). See *Lee v. Environmental Pest &*

*Termite Control, Inc.*, 271 Ga. 371, 373 (2) (516 SE2d 76) (1999) ("A trial court may issue an interlocutory injunction to maintain the status quo until the final hearing if, by balancing the relative equities of the parties, it would appear that the equities favor the party seeking the injunction."). Although the underlying action here is one of breach of contract, the trial court did not reach the final merits of that claim, which is merely ancillary to the main issue in this appeal. See *City of Waycross v. Pierce County Bd. of Commrs.*, 300 Ga. 109, 112 (1) (793 SE2d 389) (2016) (stressing that a trial court's finding of a substantial likelihood of success on the merits is not the determining factor in balancing the relative equities of the parties and that it also is not the same as a showing of ultimate success on the merits); *Byelick v. Michel Herbelin USA, Inc.*, 275 Ga. 505, 506-07 (2) (570 SE2d 307) (2002) ("The purpose of an interlocutory injunction is preliminary and preparatory; it looks to a future final hearing, and while contemplating what the result of that hearing *may be*, it does not settle what it *shall be*." (citation and punctuation omitted; emphasis in original)).

Because the trial court determined that under the facts an interlocutory injunction was warranted pending a final disposition of the case, the resolution of this appeal turns on the propriety of a discretionary ruling entered in equity. See *City of Waycross*, 300 Ga. at 111 (1) ("[T]he trial court must make a judgment call regarding the equities presented, and the court is vested with broad discretion in making that decision." (citation and punctuation omitted)). Jurisdiction is properly in this Court under OCGA § 15-3-3.1 (a) (2) because equitable principles were at the core of the trial court's determination as to whether to grant the Appellees' motion for an interlocutory injunction, that interlocutory injunction is the primary issue on appeal, and the appeal concerns a case in which a death sentence was imposed and the execution of a death sentence.[7] See

---

[7] The State also appeals the trial court's judgment denying its motion to dismiss based on sovereign immunity. We have held that a trial court's order on sovereign immunity is interlocutory in nature, and in order to invoke this Court's jurisdiction, an appeal of such an order ordinarily "must be pursued through the interlocutory procedures of OCGA § 5-6-34 (b)." *Rivera v. Washington*, 298 Ga. 770, 777 (784 SE2d 775) (2016). See *Duke v. State*, 306 Ga. 171, 172 (1) (829 SE2d 348) (2019) (explaining that an appellate court's jurisdiction to consider an appeal depends on whether the appeal is taken in substantial compliance with the applicable rules of appellate procedure).

*WXIA-TV v. State of Ga.*, 303 Ga. 428, 432 (1) n.5 (811 SE2d 378) (2018) ("We also have jurisdiction of appeals from injunctions 'concerning proceedings in (murder cases).'" (quoting OCGA § 15-3-3.1 (a) (2))). Cf. *Pittman v. Harbin Clinic Professional Assn.*, 263 Ga. 66, 66-67 (428 SE2d 328) (1993) (holding that an appeal did not sound in equity, because the trial court's orders regarding injunctive relief "were secondary to the principal issue of the construction of the contracts — an issue of law").

3. *Sovereign Immunity*. Having determined that we properly have jurisdiction in this appeal, we must first address whether the trial court erred in ruling that the April 14, 2021 e-mail exchange between the Attorney General's office and the Federal Defender

---

However, the State was not required to follow OCGA § 5-6-34 (b) here, because orders granting or refusing applications for interlocutory injunctions are directly appealable under OCGA § 5-6-34 (a) (4). Therefore, given the State's right to directly appeal the grant of the application for interlocutory injunction, it was entitled under OCGA § 5-6-34 (d) to also seek appellate review of the trial court's denial of its motion to dismiss on sovereign immunity grounds. See *Grogan v. City of Dawsonville*, 305 Ga. 79, 84 (2) (823 SE2d 763) (2019) ("Construing this provision, we have held that, where an order would require a discretionary application to be appealed, such an application is unnecessary when the order is appealed with another order that may be appealed by a notice of appeal.").

constituted a written contract sufficient to waive sovereign immunity. See *Polo Golf and Country Club Homeowners Assn., Inc. v. Cunard*, 306 Ga. 788, 790 (1) (a) (833 SE2d 505) (2019) ("Sovereign immunity is a threshold determination that must be ruled upon *prior* to the case moving forward on the more substantive matters." (emphasis in original)); *McConnell v. Dept. of Labor*, 302 Ga. 18, 19 (805 SE2d 79) (2017) ("[T]he applicability of sovereign immunity is a threshold determination, and, if it does apply, a court lacks jurisdiction over the case and, concomitantly, lacks authority to decide the merits of a claim that is barred." (footnote omitted)).

The Georgia Constitution provides that "sovereign immunity extends to the state and all of its departments and agencies" and that the State's sovereign immunity can only be waived by a constitutional provision or an act of the General Assembly that specifically provides for such a waiver and the extent thereof. Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e). See *Ga. Dept. of Natural Resources v. Center for a Sustainable Coast, Inc.*, 294 Ga. 593, 602 (2) (755 SE2d 184) (2014) (adopting "a bright line rule that only the

19

Constitution itself or a specific waiver by the General Assembly can abrogate sovereign immunity" based on "the only natural and reasonable reading of Paragraph IX regarding waivers and sovereign immunity"). Here, the Appellees brought their lawsuit against the State and the Attorney General in his official capacity; therefore, sovereign immunity would bar the Appellees' action unless it came within some exception. See OCGA § 45-15-1 (providing for "an Attorney General of the state"); OCGA § 45-15-30 ("There is created a Department of Law with the Attorney General at the head thereof. . . ."). One of the exceptions to the defense of sovereign immunity is for "any action ex contractu for the breach of any written contract . . . entered into by the state or its departments and agencies." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (c). See also OCGA § 50-21-1 (a) ("The defense of sovereign immunity is waived as to any action ex contractu for the breach of any written contract . . . entered into by the state, departments and agencies of the state, and state authorities.").

"[B]ecause sovereign immunity is jurisdictional, it requires the

20

*plaintiff* to prove any waiver thereto and is properly raised [as a defense] under OCGA § 9-11-12 (b) (1)." *Spann v. Davis*, 312 Ga. 843, 850 (2) n.11 (866 SE2d 371) (2021) (emphasis in original). To meet this burden, the plaintiff must show "that the contract sought to be enforced is in writing and contains all of the terms necessary to constitute a valid contract." *Ga. Dept. of Community Health v. Data Inquiry, LLC*, 313 Ga. App. 683, 685 (1) (722 SE2d 403) (2012). In considering a motion to dismiss for lack of subject matter jurisdiction on sovereign immunity grounds under OCGA § 9-11-12 (b) (1), a trial court is not confined to the allegations of the complaint but is authorized to "hear the matter on affidavits presented by the respective parties, [or to] direct that the matter be heard wholly or partly on oral testimony or depositions." OCGA § 9-11-43 (b). See *Rivera v. Washington*, 298 Ga. 770, 778 (784 SE2d 775) (2016) (explaining that a trial court may receive evidence and make relevant factual findings to decide the threshold issue of whether a defendant's entitlement to sovereign immunity deprives the court of subject matter jurisdiction).

21

In this case, the Appellees claim that the State waived its sovereign immunity by entering into the Agreement as memorialized in the e-mail exchange between Arceneaux, Burton, Graham, and others. The trial court held a hearing during which it received additional evidence from the Appellees,[8] which the court relied on in its order denying the motion to dismiss based on sovereign immunity. Furthermore, on appeal the State does not enumerate as error any ruling by the trial court regarding the nature of the evidence upon which the trial court based its jurisdictional determination. Therefore, "[w]hether sovereign immunity has been waived under the undisputed facts of this case is a question of law, and this Court's review is de novo." *Ga. Dept. of Labor v. RTT Assoc., Inc.*, 299 Ga. 78, 81 (1) (786 SE2d 840) (2016). See also *Center for a Sustainable Coast*, 294 Ga. at 596 (2). For the reasons set forth below, we conclude as a matter of law that the Appellees' action ex contractu was not barred by sovereign

---

[8] As noted above, the State did not seek to introduce any evidence or live testimony at the hearing, and it also refused the opportunity to cross-examine the Appellees' witnesses.

22

immunity and reject the State's arguments that (1) as a matter of general principles of contract, e-mails cannot create a written contract sufficient to waive sovereign immunity; (2) the Georgia Uniform Electronic Transactions Act ("GUETA"), see OCGA § 10-12-1 et seq., does not apply to the Agreement; (3) the Agreement did not include a written signature; (4) the Agreement failed to specify parties who are able to contract because Burton did not have the authority to contract on behalf of the Attorney General's office and the Federal Defender was not a party to the Agreement; (5) the Agreement is not supported by adequate consideration; and (6) the terms of the Agreement are too vague to be enforceable.

(a)    The State first contends that the trial court erred in denying its motion to dismiss because "no Georgia appellate court has ever held that mere e-mails create a written contract sufficient to waive sovereign immunity" and an exchange of e-mails involving state employees therefore cannot *ever* form a written contract for sovereign immunity purposes. See *RTT Assoc.*, 299 Ga. 78; *Bd. of Regents of the Univ. System of Ga. v. Winter*, 331 Ga. App. 528 (771

23

SE2d 201) (2015), overruled on other grounds by *Rivera*, 298 Ga. at 778 n.7; *Data Inquiry*, 313 Ga. App. 683.

While it is true that no appellate court in this State has explicitly held that e-mails may constitute a written contract for purposes of waiving sovereign immunity, none of the cases that the State relies upon holds that e-mails cannot *ever* form a written contract sufficient to waive sovereign immunity. *RTT Associates* involved a written contract between a vendor and a state agency. See 299 Ga. at 78. After the contract expired, the parties continued to communicate and work together on the project until the parties became dissatisfied and the vendor sued for breach of contract. See id. at 79. This Court held that the parties' course of conduct could not extend the terms of the written contract and waive sovereign immunity. See id. at 82-83 (2). However, it is not clear whether any e-mail correspondence was actually a part of the record in *RTT Associates*, and we note that our opinion in the case did not refer to or make any determination regarding any e-mails between the parties.

*Data Inquiry* is also inapposite. In that case, a vendor performed work for a state agency pursuant to a services agreement, even though the agreement was still being negotiated and the agreement expressly provided that it would not be effective until executed by both parties and the state agency paid a retainer. See *Data Inquiry*, 313 Ga. App. at 683-84. In suing for breach of contract, the vendor submitted the proposed contract between the parties and e-mails, which "showed that the protective order [that was required by the terms of the proposed agreement] was still in the drafting stages and that the [parties] were still negotiating its terms." Id. at 685. No one in *Data Inquiry* contended, as in this case, that the e-mail correspondence constituted the final written contract between the parties, and the Court of Appeals never considered that issue.

Lastly, the State points to *Winter*. In that case, the Court of Appeals rejected Winter's argument that he accepted an offer of employment via e-mail, stating only that "[t]here [wa]s no evidence whatsoever of a written employment agreement dated at or about the time that Winter contends he accepted employment." *Winter*,

331 Ga. App. at 532 (2) (a). A review of the facts in *Winter* shows that, even assuming that the parties' e-mails constituted an offer and acceptance, it is unclear whether the e-mail exchange at issue contained all of the other necessary terms of the contract. See id. at 528-29; *Moreno v. Strickland*, 255 Ga. App. 850, 852 (1) (567 SE2d 90) (2002) ("A definite offer and complete acceptance, for consideration, create a binding contract."). Moreover, in a footnote, the Court of Appeals also rejected "Winter's argument that pursuant to the former Georgia Electronic Records and Signature[s] Act (Ga. L. 1997, p. 1052, § 1) his e-mails constituted signed writings sufficient to establish a written agreement for purposes of waiving sovereign immunity" because Winter had not shown that he had ever provided an electronic signature or that the Board of Regents had agreed to be bound by electronic signatures.[9] *Winter*, 331 Ga. App. at 532 (2) (a) n.6.

In short, the State has not cited a single case, nor are we aware

---

[9] The Georgia Electronic Records and Signatures Act was replaced by the GUETA in 2009. See OCGA § 10-12-1 et seq. (as amended by Ga. L. 2009, p. 698, § 1).

26

of one, in which our appellate courts have adopted a per se rule that e-mails cannot create a written contract sufficient to waive sovereign immunity. To the contrary, the great weight of authority has indicated that, as a general matter, e-mails may constitute written contracts. See, e.g., *LNV Corp. v. Studle*, 322 Ga. App. 19, 22-23 (2), (2) (a) (743 SE2d 578) (2013) (holding that an e-mail exchange between the parties' attorneys constituted a written contract where counsel for one party "unambiguously" set forth the terms of a settlement offer and counsel for the other party "unequivocally" accepted the offer); *Johnson v. DeKalb County*, 314 Ga. App. 790, 793-94 (1) (726 SE2d 102) (2012) (holding that an e-mail exchange between counsel for the parties constituted an enforceable written contract where the county renewed its offer in an e-mail to the appellants, "the essential elements of the agreement were clear," and appellants' counsel "unequivocally accepted" the county's offer). Accord *Lytle v. King's Constr. Co.*, No. 1:14-cv-288-GGB, 2015 U.S. Dist. LEXIS 188427, at *7-8 (IV) (N.D. Ga. July 30, 2015) ("Georgia courts have held that a contract (specifically a

settlement agreement) may be formed over e-mail." (citing *LNV Corp.*, 322 Ga. App. 19)). Accordingly, we see no reason under general principles of contract law why a contract cannot be memorialized in an e-mail for purposes of determining whether the State has waived its sovereign immunity.

(b) The State also contends that the trial court erred in applying OCGA § 10-12-7 of the GUETA[10] to support that the e-mail exchange forming the Agreement constituted a valid written contract for sovereign immunity purposes because the Appellees presented no evidence that the Attorney General or the Department of Law had "agreed to send, accept, or rely upon electronic signatures or authorized his subordinates to do so in this instance or in any e-mail communication." See OCGA § 10-12-18 (a)

---

[10] OCGA § 10-12-7 (a) provides that "[a] record or signature shall not be denied legal effect or enforceability solely because it is in electronic form." In addition, that statute goes on to state that "[a] contract shall not be denied legal effect or enforceability solely because an electronic record was used in its formation," OCGA § 10-12-7 (b), and that "[i]f a law requires a record to be in writing, an electronic record shall satisfy the law," OCGA § 10-12-7 (c). An e-mail satisfies the definition of an "[e]lectronic record." See OCGA § 10-12-2 (7) ("'Electronic record' means a record created, generated, sent, communicated, received, or stored by electronic means.").

28

(providing that each state agency "shall determine whether, and the extent to which, it will send and accept electronic records and electronic signatures to and from other persons and otherwise create, generate, communicate, store, process, use, and rely upon electronic records and electronic signatures"); OCGA § 10-12-18 (c) (providing that, apart from an exception not relevant here, the GUETA shall not require a state agency "to use or permit the use of electronic records or electronic signatures").

To determine whether the GUETA applies, we begin by examining the text, structure, and history of the GUETA. As we have explained,

> [i]n interpreting statutes, we presume that the General Assembly meant what it said and said what it meant. And so we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. The common and customary usages of the words are important, but so is their context. For context, we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question. Moreover, all statutes relating to the same subject matter are to be construed together, and harmonized wherever possible.

29

*Langley v. State*, 313 Ga. 141, 143 (2) (868 SE2d 759) (2022) (citations and punctuation omitted). In addition, "[w]hen we consider the meaning of a statutory provision, we do not read it in isolation, but rather, we read it in the context of the other statutory provisions of which it is a part." *Hartley v. Agnes Scott College*, 295 Ga. 458, 462 (2) (b) (759 SE2d 857) (2014) (citation and punctuation omitted).

OCGA § 10-12-3 (a) provides that "[e]xcept as otherwise provided in subsection (b) of this Code section,[11] this chapter shall apply to electronic records and electronic signatures relating to a transaction." In turn, a "[t]ransaction" is defined as "an action or set of actions occurring between two or more persons relating to the conduct of business, commercial, or governmental affairs." OCGA § 10-12-2 (16). And "'[p]erson' means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, governmental agency, public corporation,

_____

[11] The State does not claim that any of the exceptions under subsection (b) apply here.

or any other legal or commercial entity." OCGA § 10-12-2 (12). "Governmental agency" is further defined as "an executive, legislative, or judicial agency, department, board, commission, authority, institution, or instrumentality of the federal government or of a state or of a county, municipality, or other political subdivision of a state." OCGA § 10-12-2 (9). However, the GUETA is applicable "only to transactions between parties each of which has agreed to conduct transactions by electronic means." OCGA § 10-12-5 (b). "Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." Id.

Here, it is clear under the plain language of the GUETA that the Agreement constitutes a "transaction" under the Act and that the State and the Appellees are considered "persons" involved in that "transaction." Therefore, the key question is whether the parties agreed to conduct the transaction by electronic means under OCGA § 10-12-5 (b). Although the trial court did not expressly rule on this issue, it implicitly found the GUETA to be applicable by

31

applying OCGA § 10-12-7 to find that the e-mail exchange forming the Agreement constituted a valid written contract for sovereign immunity purposes. Moreover, in denying the State's motion to dismiss, the trial court found that "the parties intended to be bound by the Agreement"; that the e-mail "was the result of months of negotiations between the Attorney General's Office and the parties by way of Anna Arceneaux"; that the Attorney General was aware of the negotiations; that the e-mail was "initiated by Deputy Attorney General Beth Burton"; that the e-mail states, "Anna, instead of a formal MOU, we will agree, and this email serves as the agreement that . . ."; and that Graham subsequently confirmed the Agreement by e-mail reply. In addition, the trial court found that the State "presented no evidence to refute [the Appellees'] contention that Graham and Burton had authority to negotiate and bind." These findings are sufficient to support the trial court's implicit conclusion that the State consented to conducting the transaction by electronic means. See OCGA § 10-12-5 (b).

Furthermore, despite the State's contentions, nothing in OCGA

§ 10-12-18 (a) or (c) excepts the State from the GUETA under these circumstances. Although subsection (a) mandates that "each governmental agency of this state shall determine whether, and the extent to which, it will send and accept electronic records and electronic signatures[,]" it does not require that this determination be made in any particular form and does not preclude the State from determining to enter into the Agreement by e-mail. And there was no evidence presented that the State had made a determination *not* to enter into the Agreement by e-mail. Likewise, subsection (c) only makes clear that a governmental agency is not required to use electronic records or electronic signatures but does not prohibit the State from choosing to do so.

Moreover, construing OCGA § 10-12-18 (a) and (c) as the State urges us to do would allow governmental agencies to invoke OCGA § 10-12-18 to invalidate an electronic transaction despite the fact that "the context and surrounding circumstances, including the parties' conduct," demonstrated that the parties had agreed to conduct the transaction electronically, thereby rendering OCGA §

33

10-12-5 (b) meaningless with respect to governmental agencies. See *Scott v. State*, 295 Ga. 39, 40 (1) (757 SE2d 106) (2014) ("[A] statute is to be construed to give sensible and intelligent effect to all its provisions and to refrain from any interpretation which renders any part of the statute meaningless." (citation and punctuation omitted)).

Accordingly, we reject the State's argument that OCGA § 10-12-18 (a) and (c) required the Appellees to show that the Attorney General or the Department of Law had expressly adopted the GUETA in order for its provisions to apply. Instead, we conclude that, because the term "transaction" in the GUETA is defined to include actions between two or more persons relating to the conduct of "governmental affairs," OCGA § 10-12-2 (16), and the term "person" is defined to include a "governmental agency," OCGA § 10-12-2 (12), when a governmental agency such as the Department of Law is engaged in a transaction within the scope of the GUETA, see OCGA § 10-12-3, its provisions will apply, if "the context and surrounding circumstances, including the parties' conduct,"

34

demonstrate that the parties "agreed to conduct [the particular] transaction[ at issue] by electronic means," OCGA § 10-12-5 (b). And because the evidence supports the trial court's implicit conclusion that the State determined to conduct the transaction by electronic means, the trial court did not err in applying the GUETA to the facts of this case.

(c) Having concluded that the parties agreed to conduct the transaction at issue by electronic means, we must next determine whether the April 14 e-mail exchange actually constitutes a *written* contract between the parties that waives sovereign immunity. "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." OCGA § 13-3-1. Unless all of these essential terms are in writing, there is no enforceable *written* contract for sovereign immunity purposes. See *Bd. of Regents of the Univ. System of Ga. v. Tyson*, 261 Ga. 368, 369-70 (1) (404 SE2d 557) (1991) (holding that, where the essential term of consideration was not contained in the

contract but instead had to be implied from the parties' conduct, there was no written contract for sovereign immunity purposes).

Moreover, because "[g]eneral rules of contract law that might otherwise support a claim for breach of contract damages between private parties . . . will not support a claim against the state or one of its agencies if the contract is not in writing so as to trigger the waiver of sovereign immunity," a party may not recover for breach of contract against the State based on an implied contract, on a theory of quantum meruit, or on the parties' course of conduct. *RTT Assoc.*, 299 Ga. at 82-83 (2). Relying on this principle of law, the State contends that the e-mail exchange constituting the Agreement was insufficient to waive sovereign immunity because it did not contain all of the necessary elements of a contract. We disagree.

As an initial matter, the State contends that only a *signed* written contract is sufficient to waive sovereign immunity. Pretermitting whether the State is correct that a written contract must be signed in order to waive sovereign immunity, we reject the contention that the trial court erred in finding that the Agreement

36

"was signed with [Burton's] electronic signature."[12]

In subdivision (b) above, we concluded that the GUETA applies to this transaction, and that Act specifies that, "[i]f a law requires a signature, an electronic signature shall satisfy the law." OCGA § 10-12-7 (d). An "[e]lectronic signature" is defined as "an electronic

---

[12] The Appellees correctly point out that the plain language of both the constitutional and the statutory provisions waiving sovereign immunity for breach of contract claims requires only that a contract be *written*, and *not that it be signed,* in order to waive sovereign immunity. See Ga. Const. of 1983, Art. I, Sec. II, Par. IX (c); OCGA § 50-21-1 (a). Yet, despite the fact that no specific signature requirement appears in the constitutional or statutory provisions in Georgia law governing the waiver of sovereign immunity for ex contractu claims, see Ga. Const. of 1983, Art. I, Sec. II, Par. IX (c); OCGA § 50-21-1 (a), this Court, without any analysis or explanation, imported such a requirement into a sovereign immunity case directly from a case that concerned the Statute of Frauds. See *Tyson*, 261 Ga. at 369 (1) (adopting a rule permitting the formation of a contract from multiple, *signed,* contemporaneous documents, relying on *Baker v. Jellibeans, Inc.*, 252 Ga. 458, 460 (1) (314 SE2d 874) (1984), a Statute of Frauds case where signatures were *clearly* required). See also *RTT Assoc.*, 299 Ga. at 87 (3) (citing *Tyson*, 261 Ga. at 369 (1)). The Court of Appeals has followed suit numerous times. See, e.g., *Winter*, 331 Ga. App. at 533-34 (2) (b) (i) - (ii) (citing *Tyson*, 261 Ga. at 369 (1), and *Baker*, 252 Ga. at 460 (1)); *Bd. of Regents of the Univ. System of Ga. v. Ruff*, 315 Ga. App. 452, 456-57 (2) (726 SE2d 451) (2012) (quoting *Bd. of Regents of the Univ. System of Ga. v. Doe*, 278 Ga. App. 878, 881 (1) (a) (630 SE2d 85) (2006), which relied on *Tyson*, 261 Ga. at 369-70 (1), and *Baker*, 252 Ga. at 459 (1)), overruled on other grounds by *Rivera*, 298 Ga. at 778 n.7; *Data Inquiry*, 313 Ga. App. at 686-87 (1) (b) (citing *Tyson*, 261 Ga. at 369-70 (1)). However, because we conclude that the trial court did not err in finding that the Agreement contained Burton's electronic signature, we need not consider whether *Tyson* and its progeny correctly required a signed writing in order to waive sovereign immunity.

sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." OCGA § 10-12-2 (8). This Court has not considered how these rules apply to e-mails. However, while the National Conference of Commissioners on Uniform State Laws ("NCCUSL") commentary to the UETA cannot change the plain meaning of our relevant statutes, we find that commentary instructive on this issue.[13] The comment to § 2 explains that "[t]he idea of a signature is broad and not specifically defined" and that "[n]o specific technology need be used in order to create a valid signature." UETA

---

[13] The General Assembly replaced the Georgia Electronic Records and Signatures Act with the GUETA effective July 1, 2009, by adopting in its entirety and essentially verbatim the UETA. See Ga. L. 2009, p. 698, § 1; OCGA § 10-12-4. "The UETA was originally drafted by NCCUSL in 1999." 2 James S. Rankin, Jr., Kaplan's Nadler: Ga. Corp. Law, LP & LLC § 15:16 n.2 (Oct. 2022 update). Therefore, we see the NCCUSL commentary to the UETA, which is available at the Uniform Law Commission's website at https://uniformlaws.org, as useful in construing the GUETA. See *State v. Almanza*, 304 Ga. 553, 559 (3) n.6 (820 SE2d 1) (2018) (noting that "although Advisory Committee Notes [to the Federal Rules of Evidence] are not binding precedent and cannot change the plain meaning of the law or rules, they are highly persuasive (unlike ordinary legislative history)"); *Bishop*, 288 Ga. at 606-07 (3) (b) (quoting the official commentary and citing the prefatory note to the Uniform Fraudulent Transfer Act ("UFTA") promulgated by the NCCUSL, on which the Georgia UFTA was modeled, in addressing an issue involving the Georgia UFTA).

§ 2, cmt. at 8. The commentary also points out that the Act's definition only requires (1) "that the signer execute or adopt the sound, symbol, or process with the intent to sign the record" and (2) "that the symbol must in some way be linked to, or connected with, the electronic record being signed." Id. at 9. Accordingly, "the critical element is the intention to execute or adopt the sound or symbol or process for the purpose of signing the related record." Id. In particular, "the mere inclusion of one's name as a part of an e-mail message" may suffice if the other essential elements in the definition are met. Id. at 10. "Whether any particular record is 'signed' is a question of fact[, and p]roof of that fact must be made under other applicable law." Id. at 8.

The evidence shows that Burton's e-mail containing the terms of the Agreement included her manually-typed name at the bottom of the e-mail and that she was identified as its sender by her name and e-mail address at the top of the e-mail. In the body of the e-mail, Burton clearly identified the Agreement as the replacement for the previously negotiated MOU and as what the Attorney General's

office considered to be the final agreement between the parties. Burton's manually-typed name constitutes an "electronic symbol," and, because Burton included the terms of the Agreement in the body of her e-mail, her manually-typed name followed directly after the terms of the Agreement, which both evidences her intent to sign the Agreement and clearly connects her signature with the Agreement.

Similarly, the trial court's finding that "[s]aid email was ratified by Sabrina Graham" is supported by evidence showing that Graham confirmed the Agreement in an e-mail that identified Graham as its sender by her name and e-mail address at the top of the e-mail, that contained her manually-typed name at the conclusion of the e-mail, and that was in the same e-mail exchange as Burton's e-mail containing the terms of the Agreement. Accordingly, after applying the plain meaning of OCGA §§ 10-12-7 (d) and 10-12-2 (8) to these facts, we conclude that the requirements for an electronic signature under the GUETA have been met with

40

regard to both Burton and Graham.[14] See *Intl. Casings Group, Inc. v. Premium Standard Farms, Inc.*, 358 FSupp.2d 863, 873 (II) (A) (2) (b) (W.D. Mo. 2005) (holding that the names of the parties' representatives at the header of the e-mails or typed at the bottom of the e-mails, combined with evidence that the named individuals pushed the "send" button to deliver the e-mails, were sufficient to constitute an "electronic signature" under Missouri's UETA); *Waddle v. Elrod*, 367 SW3d 217, 228-29 (Tenn. 2012) (holding that the typed name of the attorney representing the party to be charged appearing at the end of an e-mail confirming the terms of a settlement agreement constituted an "electronic signature" under Tennessee's UETA).

(d) The State also contends that the Agreement failed to specify parties who are able to contract because (1) Burton did not have the

---

[14] To the extent that the State is arguing that a written contract otherwise sufficient to waive sovereign immunity must include the signatures of *all* of the parties to the contract, we note that Benton was involved in the e-mail exchange concerning the Agreement and provided her electronic signature showing her assent to the terms of the Agreement on behalf of the Federal Defender. Thus, we conclude that representatives of both the State and the Federal Defender signed the Agreement with their electronic signatures.

authority to contract and (2) the Federal Defender was not a party to the Agreement. We disagree as to both.

In ruling on the issue of whether Burton had the authority to contract, the trial court considered the following undisputed evidence. Burton is a Deputy Attorney General, i.e., "a senior administrator at the Attorney General's Office." In her role as Deputy Attorney General, she not only participated with Senior Assistant Attorney General Graham on the State's behalf in months-long negotiations regarding the subject of the Agreement but, in fact, she "spearhead[ed]" those negotiations. No other persons from the Attorney General's office, including the Attorney General himself, participated directly in those negotiations. On March 11, 2021, Graham e-mailed Arceneaux that she was awaiting "input" from the Attorney General, evidencing his awareness of the negotiations and the terms of the Agreement. In the same e-mail, Graham wrote that she was "still working on the DAs" and added that, "[s]o far the DAs ha[d] agreed to the timeline proposal," thereby indicating that she had the authority to consult with and

negotiate for the affected district attorneys — the very parties that the State now claims are the only persons who are able to obtain an execution order. On March 16, 2021, Graham told Arceneaux in an e-mail regarding the proposed MOU that she had "[t]ouched base with the Deputy AG" and that "he w[ould] be getting back with [them] soon."

It appears from the record that, after the initial meeting on February 10, 2021, Graham and Arceneaux conducted most or all of the negotiations to finalize an agreement between the parties. However, on April 14, 2021, which was approximately a month after Graham had indicated that she was awaiting responses from the Attorney General and the Deputy Attorney General, Graham called Arceneaux to say that Burton, *Graham's supervisor,* would be sending an e-mail memorializing the terms of the agreement, thereby indicating that the necessary authority to enter into the forthcoming agreement had been obtained. Soon thereafter, Burton did in fact send an e-mail to Arceneaux in which she unambiguously stated that "th[e] email" contained the terms to which the Attorney

43

General's office "w[ould] agree" and that, "instead of a formal MOU [which Graham and Arceneaux had been negotiating], . . . th[e] email serve[d] as the agreement."

At the hearing and in its order denying the State's motion to dismiss, the trial court described the foregoing evidence and then pointed out that the State had identified no statutory restriction on Graham's or Burton's general authority to negotiate and contract on behalf of the Attorney General's office and had presented no evidence or case law suggesting that either Graham or Burton was not acting as an agent or designee of the Attorney General and the Attorney General's office in this particular matter. Accordingly, the trial court ruled that Burton and Graham had the authority to negotiate the Agreement and that Burton had the authority to contract on behalf of the State.

The State asserts that the trial court's ruling was error, arguing that, under OCGA § 45-15-3 (2), the Attorney General has the duty "to prepare all contracts and writings in relation to any matter in which the state is interested" and that, under OCGA § 45-

15-30, the Attorney General is the head of the Department of Law and as such "define[s] the duties and responsibilities of any attorney or other employee of the said department." Therefore, the State contends, *only the Attorney General* is authorized to contract on behalf of the State or the Department of Law unless that authority is expressly delegated. See *City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 28 (2) (c) (743 SE2d 381) (2013) ("[T]he power of public officials in Georgia is limited by the laws that prescribe their authority."). Accordingly, the State argues, because the Appellees did not present affirmative evidence that the Attorney General or the State of Georgia explicitly authorized Burton to enter into a contract on their behalf — such as evidence of a written policy in which the Attorney General expressly delegated the authority to contract to deputy attorneys general collectively or to Burton specifically — the trial court erred in finding that Burton had such authority.

However, OCGA § 45-15-3 generally describes the duties of the Attorney General's *office*. It is axiomatic that the Attorney General

45

is not legally required to personally carry out every one of the duties listed in that statute but that he or she may appoint appropriate staff to assist him or her in doing so. See, e.g., *Outdoor Advertising Assn. of Ga., Inc. v. Garden Club of Ga., Inc.*, 272 Ga. 146, 149-50 (2)(a) (527 SE2d 856) (2000) (stating that the evidence showed that, when the litigation involved was filed, the office of the Attorney General entered an appearance as counsel for the Department of Transportation and that "[t]hen[-]Deputy Attorney General George P. Shingler had primary responsibility for the case," that "Shingler never discussed the case with [the Attorney General]," that "[the Attorney General] made no court appearances in connection with the litigation," and that the Attorney General "was not personally and substantially involved in the deliberative processes regarding those matters"). Indeed, OCGA § 45-15-30, cited by the State for the proposition that the Attorney General is the head of the Department of Law, created the

> Department of Law with the Attorney General at the head thereof *and* with such numbers of deputy attorneys general, assistant attorneys general, special assistant

46

attorneys general, other attorneys, paraprofessional personnel, and other employees or independent contractors as the Attorney General shall deem necessary *to carry out the functions of the Attorney General and the Department of Law*.

(Emphasis supplied.)

As relevant here, OCGA § 45-15-30 also authorizes the Attorney General "to determine the title and to change the title of any attorney . . . of the Department of Law . . . in order to define the duties and responsibilities of any attorney" of the department. In that regard, the Appellees presented evidence at the hearing that shows the following. Burton serves as the Deputy Attorney General of the Criminal Justice Division, which makes her "the highest-ranking state criminal lawyer in Georgia." According to the organizational chart of the Attorney General, she serves directly under the Chief Deputy Attorney General, who serves directly under the Attorney General. In her role as Deputy Attorney General of the Criminal Justice Division, Burton oversees the Capital Litigation Section, the Post-Conviction Litigation Section, and the Public

47

Safety Section. The Criminal Justice Division represents the State of Georgia in all capital felony appeals in both state and federal courts. The division also provides general legal representation to the various public safety and law enforcement agencies in the State, including but not limited to the DOC and the State Board of Pardons and Paroles — both agencies that had an interest in or were affected by the Agreement.

Graham is a Senior Assistant Attorney General and the Section Chief of the Capital Litigation Section. She reports to Deputy Attorney General Burton. Furthermore, according to the record, either Burton or Graham, as Deputy Attorney General and Senior Assistant Attorney General, respectively, is listed as counsel for the respondent in the federal habeas proceedings in every case affected by the Agreement. The record also supports a conclusion that in their specific positions on the Attorney General's staff and in their capacity as counsel in the cases involved, Burton and Graham were authorized to act on behalf of the Attorney General. See *Riding v. Ellis*, 297 Ga. App. 740, 741 (678 SE2d 178) (2009) (stating that

the defendants, a professor and other personnel at a state university, "were represented in the federal action by appellee Ralph Ellis, in his capacity as an assistant attorney general with the Attorney General's Office" and that Ellis negotiated a settlement agreement with the plaintiff, a former student).

The State also cites OCGA § 45-6-5 for the proposition that a state agency's employees cannot bind the State absent an express power to do so, but that statute merely provides that "[p]owers of all public officers are defined by law and all persons must take notice thereof." As explained above, the duties and responsibilities of the Attorney General include, "[w]hen he deems it advisable, . . . prepar[ing] all contracts and writings in relation to any matter in which the state is interested." OCGA § 45-15-3 (2). The subject matter of the Agreement — the orderly management of execution-eligible capital cases following the COVID-19 pandemic — is clearly a matter in which the State is interested, and, accordingly, the Attorney General acting through appropriate staff had the power to contract in this matter.

Finally, the State relies on three cases to support its contention. However, we conclude that those cases are inapposite, as each involved a city official's authority, or lack thereof, to enter into binding contracts on behalf of the city based on mandatory provisions of the law, such as municipal ordinances and city charters. See *Woodard & Curran*, 293 Ga. at 29 (2) (d) (holding that a purported municipal contract between the city and a service provider was ultra vires and void because it was signed by the mayor, who had no unilateral authority under the city charter to approve contracts that would bind the city); *H.G. Brown Family Ltd. Partnership v. City of Villa Rica*, 278 Ga. 819, 820-21 (1) (607 SE2d 883) (2005) (holding that the city's contract to purchase property was "ultra vires, null and void" because the city did not comply with the requirements in its charter); *City of Atlanta v. Black*, 265 Ga. 425, 425-26 (457 SE2d 551) (1995) (holding that a restriction in a municipal ordinance that required the city attorneys to obtain the city council's approval prior to settling claims in excess of $500 circumscribed the city attorneys' apparent authority to bind the city

50

to a settlement agreement for payment of $37,500 where the plaintiffs took no steps to ascertain whether the city attorneys had obtained the necessary approval and the city attorneys did not represent that they had).

In contrast in this case, the State fails to point to any law, regulation, or policy expressly circumscribing Burton's or Graham's authority to negotiate and bind the Attorney General and the State to the Agreement, nor has the State taken the position that Burton or Graham was not actually given the authority by the Attorney General to enter into the Agreement, arguing only that the Appellees have failed to produce evidence of any such designation of authority. Moreover, at the hearing on the State's dismissal motion, counsel for the Attorney General's office stated that she did not contend that Graham or Burton went "rogue," and the trial court stated that "certainly it d[id] not appear to the [c]ourt . . . , even by the State's own argument, that Ms. Burton or Ms. Graham we[nt] rogue."

Accordingly, in the absence of proof of a limitation on Burton's

or Graham's authority to represent the State, we conclude that the undisputed evidence in this case supports the trial court's ruling that the Attorney General was aware of the Agreement, that Burton and Graham had the authority to negotiate its terms, and that Burton had the authority to contract on behalf of the Attorney General and the State in this instance. See *DeKalb County v. DRS Investments, Inc.*, 260 Ga. App. 225, 227 (1) (581 SE2d 573) (2003) (holding that a senior assistant county attorney had authority to bind the county to a consent order with an outdoor advertising business, where neither a relevant ordinance delineating the county attorney's role nor the business's inquiry of the county attorney yielded any express limitation upon the county attorney's settlement authority); *City of Columbus v. Barngrover*, 250 Ga. App. 589, 598 (5) (b) (552 SE2d 536) (2001) (holding that, in the absence of a specific limitation on the city attorney's authority, the trial court did not err in charging the jury that the city was bound by the conduct of the city attorney).

As for the other parties to the Agreement, the State cursorily

argues that, because Burton's initial e-mail stating what the Attorney General's office agreed to was sent only to Arceneaux, an attorney for the Georgia Resource Center, and not to the Federal Defender or any of its attorneys, the Appellees are not identified as parties to the Agreement. See *RTT Assoc.*, 299 Ga. at 82 (2).

Even though Burton sent the initial e-mail laying out the terms of the Agreement to Arceneaux, the record supports the trial court's finding that the parties understood Arceneaux to be negotiating on behalf of the Georgia Resource Center, the Federal Defender, and DeBruin, who had all participated in previous negotiations with the Attorney General's office regarding the subject matter of the Agreement and who together represented all of the inmates affected by the Agreement. Accordingly, upon receiving Burton's initial e-mail and before responding, Arceneaux added to the e-mail thread DeBruin, a private attorney representing one of the inmates affected by the Agreement, and Benton, who represented the Federal Defender, an entity representing several of the inmates affected by the Agreement. Moreover, when Benton sought clarification of the

Agreement's terms, Graham affirmed the Agreement in a response to her, Arceneaux, and DeBruin. Accordingly, all are expressly identified in writing in the e-mail exchange that forms the Agreement.[15] Thus, we reject the State's contention that the e-mail exchange did not identify the Appellees as parties to the Agreement.

(e) The State also argues that the Agreement is not a valid contract because it is not supported by consideration.

"It is axiomatic that a contract without consideration is invalid." *Thomas Mote Trucking, Inc. v. PCL Civil Constructors, Inc.*, 246 Ga. App. 306, 310 (3) (540 SE2d 261) (2000). See OCGA §

---

[15] On appeal, the State does not specifically argue that Presnell is not a party to the Agreement, nor does the State dispute the trial court's ruling that, because Presnell's petition for rehearing en banc was denied by the Eleventh Circuit during the time that the statewide judicial emergency order was in effect, Presnell is a third-party beneficiary of the Agreement. See OCGA § 9-2-20 (b) ("The beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract."); *Dillon v. Reid*, 312 Ga. App. 34, 40 (4) (717 SE2d 542) (2011) (stating that the third-party beneficiary need not be specifically named in a contract as long as the contracting parties' intention to benefit the third party is shown on the face of the contract). See also *Youngblood v. Gwinnett Rockdale Newton Community Svc. Bd.*, 273 Ga. 715, 718 (4) (545 SE2d 875) (2001) (holding that, to the extent the written agreements between a state agency and a third party constituted written contracts conferring a benefit upon the appellant as an intended beneficiary, the state agency's sovereign immunity was waived).

13-3-40 (a) ("A consideration is essential to a contract which the law will enforce."). Furthermore, "consideration must be stated in the contract or at least be ascertainable from the contract." *Newell Recycling of Atlanta, Inc. v. Jordan Jones & Goulding, Inc.*, 317 Ga. App. 464, 466 (731 SE2d 361) (2012) (citation and punctuation omitted). However, all that the law requires "is that the contract furnish a key by which the consideration may be ascertained." Id. (citation and punctuation omitted). "To constitute consideration, a performance or a return promise must be bargained for by the parties to a contract." OCGA § 13-3-42 (a). "A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." OCGA § 13-3-42 (b).

"[S]light consideration is sufficient to sustain a contract, and . . . , where there is consideration to support the contract, courts do not inquire into the adequacy of contract consideration." *ALR Oglethorpe, LLC v. Fidelity Nat. Title Ins. Co.*, 361 Ga. App. 776, 781 (2) (b) (863 SE2d 568) (2021) (citations and punctuation omitted). "It

is not essential that the person to whom the consideration moves should be benefited, provided the person from whom it moves is in a legal sense injured." *Wolfe v. Breman*, 69 Ga. App. 813, 817 (26 SE2d 633) (1943). "[F]orbearance to exercise a legal right" is sufficient consideration to support a contract, "the alteration in position being regarded as a detriment that forms a consideration independent of the actual value of the right forborne." Id. See 3 Williston on Contracts § 7:45 (4th ed. May 2022 update) ("[F]orbearance to do something which one is legally entitled to do, of almost any character, will be sufficient. . . .").

Viewing the e-mail exchange constituting the Agreement with those principles in mind, we conclude that the consideration can be ascertained from the first line of Burton's e-mail stating that the Agreement was to be in lieu of "a formal MOU,"[16] which the parties

---

[16] In the trial court and at oral argument, the State argued that, by using this language, Burton rejected a formal MOU because she did not want to enter into a contract and that "there's a difference between an agreement and a contract." At oral argument, the State also argued for the first time that Burton's e-mail was a "position statement" rather than a contract. However, we reject the State's contentions. "Under Georgia common law, 'agreement' and

had been pursuing through negotiations at the request of the Task Force Sub-Committee to try to reach an agreement instead of proposing legislation, and can be further ascertained by Arceneaux's response to Burton that, upon receipt of Burton's e-mail containing the terms of the Agreement, she "let GACDL know [that day] so they could hopefully share with the task force at [that day's] meeting." This exchange shows that, in return for the Attorney General's promise to pursue execution orders for the inmates covered by the Agreement only under the Agreement's terms, the Federal Defender relinquished its right to continue to seek a formal MOU with the Attorney General or to pursue with the GACDL's help other, perhaps-more-favorable means of resolution through the Task Force, such as legislation. Such forbearance is valid consideration. See OCGA § 13-3-42 (c) (2) (providing that consideration may consist

---

'contract' are synonymous." John K. Larkins, Jr. & Hon. John K. Larkins III, Ga. Contracts: Law and Litigation § 1:2 n.3 (2d ed. Sept. 2022 update) (citing *Douglass v. W.L. Williams Art Co.*, 143 Ga. 846, 847 (85 SE 993) (1915) ("There is no difference between a 'contract' and an 'agreement.'")). Moreover, "[a]s a code of the common law, the Code contains [the following] definition of a contract: 'A contract is an *agreement* between two or more parties for the doing or not doing of some specified thing.'" Id. at § 1:2 (quoting OCGA § 13-1-1 (emphasis supplied)).

of forbearance); *Antoskow & Assoc., LLC v. Gregory*, 278 Ga. App. 468, 471 (629 SE2d 1) (2005) ("Any benefit accruing to him who makes the promise, or any loss, trouble, or disadvantage undergone by, or charge imposed upon, him to whom it is made, is sufficient consideration to sustain a contract." (citation and punctuation omitted)).

(f) On appeal, the State argues for the first time that the Agreement is unenforceable because it is vague, pointing to the provision that it "will remain in effect only through August 1, 2022, or one year from the date on which the above-three conditions are met, whichever is later." The Appellees contend that the State waived this argument by not raising it in the trial court.

Because "[f]airness to the trial court and to the parties demands that legal issues be asserted in the trial court, . . . absent special circumstances, an appellate court need not consider arguments raised for the first time on appeal." *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002) (footnotes omitted). However, such "special circumstances" include sovereign

58

immunity claims. See id. at 829 (2) n.10. That is because "sovereign immunity of a State agency is not an affirmative defense, going to the merits of the case; instead it raises the issue of the trial court's subject matter jurisdiction to try the case." *Dept. of Transp. v. Kovalcik*, 328 Ga. App. 185, 189-90 (1) (b) (761 SE2d 584) (2014) (citation and punctuation omitted). See *Spann*, 312 Ga. at 850 (2) ("[W]e have held that Georgia courts have no subject matter jurisdiction when sovereign immunity applies."). A "court's lack of subject-matter jurisdiction cannot be waived and may be raised at any time either in the trial court, in a collateral attack on a judgment, or in an appeal." *Abushmais v. Erby*, 282 Ga. 619, 622 (3) (652 SE2d 549) (2007) (citation and punctuation omitted). See OCGA § 9-11-12 (h) (3) ("Whenever it appears, by suggestion of the parties or otherwise, that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). Moreover, the State asserted its immunity as a *general* matter in its motion to dismiss and argued its immunity at the hearing. Therefore, we will address its newly raised vagueness argument made in support of its overall

sovereign immunity claim.

The State argues that the Agreement is vague because it does not provide "a specific termination date" and that, therefore, "if the conditions are never met, then the [Agreement] could conceivably enjoin executions in Georgia forever."[17] It is true that "indefiniteness in subject matter so extreme as not to present anything upon which the contract may operate in a definite manner renders the contract void." *Burns v. Dees*, 252 Ga. App. 598, 602 (1) (a) (557 SE2d 32) (2001) (citation and punctuation omitted). However, a contract is enforceable if "it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon." *Laymac v. Kushner*, 349 Ga. App. 727, 733 (2) (824 SE2d 768) (2019) (citation and punctuation omitted). A contract "will be sufficiently definite

---

[17] The State overstates its case. The trial court's interlocutory injunction only enjoins

> [the] State of Georgia and Christopher M. Carr, in his official capacity as Attorney General of the State of Georgia, and anyone acting in active participation or concert with them, . . . from . . . pursuing any execution warrant for death-eligible prisoners, other than Billy Raulerson, *whose petitions for rehearing before the Eleventh Circuit were denied during the statewide judicial emergency*.

(Emphasis supplied.)

60

and certain if it contains matter which will enable the courts, under proper rules of construction, to ascertain the terms and conditions on which the parties intended to bind themselves." *Davidson Mineral Properties, Inc. v. Baird*, 260 Ga. 75, 79 (7) (390 SE2d 33) (1990) (citation and punctuation omitted).

Here, the Agreement's duration is sufficiently definite and ascertainable from its language about the time for performance and the conditions under which it will terminate. Accordingly, it is not void for vagueness. See *Alexis, Inc. v. Werbell*, 209 Ga. 665, 670-71 (1) (f) (75 SE2d 168) (1953) (holding that a contract providing that it would be binding so long as the corporation existed was enforceable); *Mori Lee, LLC v. Just Scott Designs, Inc.*, 325 Ga. App. 625, 630 (2) (754 SE2d 616) (2014) (holding that an agreement providing that it "would continue for as long as both parties conducted business" was not rendered void by "this indefinite duration"); *Triple Eagle Assoc., Inc. v. PBK, Inc.*, 307 Ga. App. 17, 22-23 (2) (a) (704 SE2d 189) (2010) (holding that "the phrase 'suitable period of time'" did not render a settlement agreement unenforceable).

(g) For all of the reasons set forth at length above in this division, we conclude that the April 14 e-mail exchange constituting the Agreement formed a valid written contract between the parties and that the trial court, therefore, properly denied the State's motion to dismiss on sovereign immunity grounds.

4. *The Interlocutory Injunction.* The State contends that the trial court abused its discretion by issuing an interlocutory injunction. "The purpose of an interlocutory injunction is to preserve the status quo, as well as balance the conveniences of the parties, pending final resolution of the litigation." *Veterans Parkway Developers, LLC v. RMW Dev. Fund II, LLC*, 300 Ga. 99, 102 (793 SE2d 398) (2016). We have previously explained:

> An interlocutory injunction is an extraordinary remedy, and the power to grant it must be "prudently and cautiously exercised." However, to be effective, the decision to grant an interlocutory injunction must often be made under time constraints that do not allow for the careful deliberation and reflection that accompany a full trial on the merits. Thus, the trial court must make a judgment call regarding the equities presented, and the court is vested with broad discretion in making that decision. See OCGA § 9-5-8 ("The granting and continuing of injunctions shall always rest in the sound discretion of

the judge. . . ."). The grant or denial of an interlocutory injunction will not be reversed on appeal unless the trial court made an error of law that contributed to the decision, there was no evidence on an element essential to relief, or the court manifestly abused its discretion.

*City of Waycross*, 300 Ga. at 110-11 (1) (citations and punctuation omitted).

In deciding whether to impose an interlocutory injunction, a trial court should consider whether the following factors exist:

(1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

*City of Waycross*, 300 Ga. at 111 (1) (citation and punctuation omitted). Because the test for granting an interlocutory injunction is a balancing test, the movant need not prove all four factors to obtain injunctive relief. See id. In this case, however, after balancing the equities, the trial court determined that all four factors weighed in favor of granting the interlocutory injunction. For the reasons

discussed below, we see no abuse of discretion in the trial court's decision to do so.

(a) We have held that the first factor concerning the threat of irreparable injury to the moving party "is the most important one, given that the main purpose of an interlocutory injunction is to preserve the status quo temporarily to allow the parties and the court time to try the case in an orderly manner." *Western Sky Financial, LLC v. State of Ga.*, 300 Ga. 340, 354 (2) (b) (793 SE2d 357) (2016) (citation and punctuation omitted). In considering this factor, the trial court pointed to evidence showing that COVID-19-related visitation restrictions had impaired the Federal Defender's ability to conduct adequate clemency investigations and the evidence showing that such investigations are a substantial undertaking requiring the collection of considerable evidence and the preparation of numerous witnesses to testify at the proceedings. The uncontested evidence also showed that, because of the lack of notice, Presnell's clemency hearing included no live testimony, including no expert testimony, unlike past clemency proceedings in

64

death penalty cases. The trial court found unconvincing the State's argument that the Federal Defender had years to prepare for Presnell's clemency hearing because the evidence showed that suitable preparation for clemency proceedings must take place in proximity to the hearing, as the type of evidence that is persuasive in a clemency hearing is evidence of an inmate's relatively recent prison behavior and current physical and mental condition. Specifically with respect to Presnell, the trial court observed that, without an injunction, he would lose his ability to protect his rights under the Agreement because he would be executed as scheduled. Accordingly, the trial court ruled that the Appellees would "suffer irreparable injury if they were permanently denied the bargained-for time and notice to prepare a clemency investigation."

In addition, the trial court rejected the State's argument that irreparable harm does not exist because Presnell's clemency hearing has already taken place and the Federal Defender was able to represent Presnell, pointing to evidence that, when executions have been stayed in the past and new execution orders have later been

issued in death row inmates' cases, the inmates have received second clemency hearings. Specifically, the evidence showed that, during the approximately eight years preceding Presnell's clemency hearing, the Board of Pardons and Paroles has held clemency hearings for every one of the twenty-two individual execution orders that were issued, regardless of whether the individual had previously had a clemency hearing.

On appeal, the State contends that the trial court erred by concluding that Presnell could receive a second clemency hearing based on evidence indicating that other death row inmates had done so, because the decision of whether to grant an inmate a second clemency hearing is at the discretion of the State Board of Pardons and Paroles, as illustrated by the fact that neither the trial court nor the Appellees have cited any rule or statute showing otherwise. However, the State misconstrues the trial court's ruling. In balancing the equities, the trial court determined that, based on the evidence, there was a "'*substantial threat*'" that the Appellees would suffer irreparable injury if the injunction were not granted. *City of*

*Waycross*, 300 Ga. at 111 (1) (citation omitted; emphasis supplied).

Such a determination did not require the trial court to find that

Presnell was *guaranteed* a second clemency hearing but only that it

is likely that the Board of Pardons and Paroles will grant him one

given past experience. Because the trial court's determination here

had support in the evidence, there was no abuse of discretion. See

*Western Sky Financial*, 300 Ga. at 354 (2) (b) (holding that the trial

court did not abuse its discretion in concluding that the threat of

irreparable harm weighed in favor of injunctive relief where there

was evidence supporting the trial court's determination).

The State also argues that the trial court abused its discretion

in weighing this factor in favor of granting the injunction because

the United States Constitution does not guarantee the right to a

"lengthy" pre-clemency preparation period like the one that the

Appellees sought. See *Ohio Adult Parole Auth. v. Woodard*, 523 U.S.

272, 289 (118 SCt 1244, 140 LE2d 387) (1998) (O'Connor, J.,

concurring in part and concurring in the judgment) (recognizing that

"some *minimal* procedural safeguards apply to clemency

proceedings" (emphasis in original)). Thus, the State contends that Presnell's rights were adequately protected, given that the Federal Defender had over six months to investigate and prepare for his clemency hearing between the exhaustion of Presnell's appellate rights in October 2021 when the United States Supreme Court denied his petition for certiorari in his federal habeas proceedings, see *Presnell v. Ford*, ___ U.S. ___ (142 SCt 131, 211 LE2d 45) (2021), and May 16, 2022, when Presnell's clemency hearing took place. However, the State's argument here only highlights the fact that the Agreement provided *additional* bargained-for benefits beyond *minimal* federal due process protections. It also fails to take into account the effect of the COVID-19 restrictions on counsel's investigations and preparations.[18]

---

[18] In its reply brief, the State argues that "[a]ny delay in Presnell's execution is only a byproduct" of the interlocutory injunction and that, therefore, the possibility of his earlier execution should not be considered a grave harm to be remedied by an injunction. However, the State's circular argument fails. Presnell's execution was "delay[ed]" as a result of the interlocutory injunction in part because the trial court weighed the factor concerning the threat of irreparable injury to the moving party in favor of granting injunctive relief based in some measure on its determination that, without the grant of such relief, Presnell would be executed as scheduled and,

As for the Federal Defender, without the interlocutory injunction it would have lost the notice that it had negotiated in order to adequately prepare for the clemency proceedings of all of its clients affected by the Agreement, including Presnell. Without this notice, the Federal Defender had no way of knowing when the Attorney General's office would resume seeking execution orders or which of the multiple execution-eligible inmates the Attorney General's office would seek an order for first. Consequently, in order to be adequately prepared, the Federal Defender would need to prepare all of its execution-eligible clients' clemency cases simultaneously. The evidence supports the trial court's finding that adequate preparation for clemency proceedings in death penalty cases requires collecting considerable evidence and preparing numerous witnesses to testify at a hearing, including in some cases expert witnesses.

Accordingly, given the facts of this case, where the Appellees

as a result, would suffer grave and irreparable injury in that he would forever lose his ability to protect his rights as a third-party beneficiary under the Agreement.

69

specifically bargained for protection against such potential harm, where the undisputed evidence supports the trial court's finding that there was a substantial threat that the Appellees would suffer irreparable harm if injunctive relief were not granted, and where monetary damages could not adequately compensate Presnell or the Federal Defender for the immediate and irreparable harm that they would suffer without the grant of injunctive relief, the trial court did not abuse its discretion in ruling that this factor favored the grant of injunctive relief. See *Sherrer v. Hale*, 248 Ga. 793, 797 (2) (285 SE2d 714) (1982) (holding that an injunction was properly granted where the appellee did not have "an adequate remedy at law (money damages)"); *English v. Little*, 164 Ga. 805, 806 (139 SE 678) (1927) ("Injunction is an appropriate remedy in a proper case to prevent acts in violation of contract, producing irreparable injury to the plaintiff. . . .").

(b)    The trial court ruled that both the factor of threatened harms and the factor of the public interest weighed in favor of granting injunctive relief. In ruling that the threatened harm that

70

the State would suffer if the injunction were granted was not outweighed by the threatened harm that the Appellees would suffer if the injunction were not granted, the trial court found that (1) the Appellees only sought to enforce "the terms of an Agreement [that the State] drafted and agreed to" in order that the Federal Defender could adequately prepare for its clients' clemency proceedings and that (2) an interlocutory injunction would "simply hold [the State] to [its] Agreement by postponing Mr. Presnell's execution warrant — it would not stop him from being executed altogether."

In considering the factor of potential disservice to the public interest, the trial court first observed that granting the injunction was "consistent with the public's interest in ensuring that reliable procedures are followed before the State imposes the ultimate punishment of death on any person," citing *Woodson v. North Carolina*, 428 U.S. 280, 305 (III) (C) (96 SCt 2978, 49 LE2d 944) (1976) (acknowledging a heightened "need for reliability in the determination that death is the appropriate punishment in a specific case"). Next, the trial court noted that our appellate courts have held

71

that "[e]nforcing agreements generally serves the public interest 'by encouraging the right and freedom to contract,'" quoting *Wood v. Wade*, 363 Ga. App. 139, 151 (2) (e) (869 SE2d 111) (2022) (punctuation omitted). See also *Nat. Cas. Co. v. Ga. School Bds. Assn.-Risk Mgmt. Fund*, 304 Ga. 224, 229 (818 SE2d 250) (2018) ("[I]t is the paramount public policy of this State that courts will not lightly interfere with the freedom of parties to contract on any subject matter, on any terms, unless prohibited by statute or public policy, and injury to the public interest clearly appears." (citation and punctuation omitted)). Finding that "this public interest is implicated even more when the State is a party to the contract, because if [the State] cannot be trusted to honor [its] agreements in these circumstances, it will substantially undermine the public's confidence in its government," the trial court then concluded that granting an interlocutory injunction would not disserve the public interest.

The State argues that the trial court abused its discretion in weighing both of these factors in favor of granting an interlocutory

72

injunction. See *Owens v. Hill*, 295 Ga. 302, 313 (4) (c) (758 SE2d 794) (2014) ("'[T]he State and the victims of crime have an important interest in the timely enforcement of a sentence.'" (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (III) (126 SCt 2096, 165 LE2d 44) (2006)). However, as the trial court concluded, an injunction here ensures that executions will proceed on the timeline that the State itself proposed — a timeline that the State presumably thought served the interests of justice when the State proposed it. Accordingly, under the circumstances here, we discern no abuse of discretion in the trial court's weighing of these factors in favor of the Appellees' right to obtain what they bargained for, particularly in light of the public policy favoring the enforcement of contracts and considering the threatened harm to the Appellees if injunctive relief were not granted. See *Wood*, 363 Ga. App. at 151-52 (2) (e).

(c) The trial court ruled that the Appellees had shown a substantial likelihood that they would succeed on their claim that the State had breached the Agreement. The trial court first found that the second and third conditions to the resumption of executions

73

contained in the Agreement had not been satisfied based on the undisputed evidence showing that (1) "normal legal visitation" and "normal visitation" at Georgia prisons "ha[d] not resumed [in] that . . . the [DOC] continue[d] to impose significant limitations on visitation" and (2) "children under the age of five still [we]re not eligible for any COVID-19 vaccine" and, therefore, "the vaccine [wa]s not available to all members of the public." The trial court then described the undisputed evidence showing that, despite the Agreement, Senior Assistant Attorney General Graham had asked the Cobb County District Attorney to seek an execution order for Presnell from the Superior Court of Cobb County where Presnell was tried and that the Attorney General's office had worked toward obtaining an execution order for death row inmate Raulerson before it began seeking Presnell's execution order. Based on the foregoing evidence, the trial court determined that the Appellees had shown a substantial likelihood that the Attorney General's office had breached its promise to not pursue execution orders from the district attorneys in the cases covered by the Agreement before the

74

Agreement's three conditions were satisfied and its promised notice was provided.

The State argues, however, that even if the e-mail exchange formed a written contract sufficient to waive sovereign immunity, there was no material breach, because it had substantially complied with the Agreement before seeking the execution order in Presnell's case. See *Dennard v. Freeport Minerals Co.*, 250 Ga. 330, 332 (1) (297 SE2d 222) (1982) ("Our general rule with respect to compliance with contract terms is not strict compliance, but substantial compliance."); OCGA § 13-4-20 ("Performance, to be effectual, . . . must be substantially in compliance with the spirit and the letter of the contract. . . ."). The trial court rejected this argument, finding that, in order to make its "substantial compliance" argument, the State "must contort" the plain language of the Agreement, "which [its] own representatives drafted."

Looking first to the condition that the Attorney General's office would not pursue an execution order from the district attorney in the defined cases before "the [DOC] lift[ed] its suspension of legal

75

visitation, and normal visitation resume[d]," the State argues that this condition had been substantially satisfied because the undisputed evidence shows that on April 7, 2021, the DOC had lifted its total suspension of visitation and instituted "modified" visitation procedures and that this modified visitation shows that visitation had resumed at the time that Presnell's execution order was issued, albeit admittedly with restrictions. According to the State, a "new standard" of visitation now exists with regard to both legal and normal visitation as a result of the DOC's need to adapt to the "new normal" in a post-pandemic society. Thus, the State contends that at the time that the execution order in Presnell's case was obtained, the new standard for legal and normal visitation had been resumed and that neither logic nor the Agreement's language requires that legal or normal visitation return to exactly how it was before the pandemic.

However, we reject the contention that the resumption of "modified" or restricted visitation on April 7, 2021, was what the parties intended regarding the second condition of the Agreement,

given the fact that the parties entered the Agreement a week *after* the DOC initiated this visitation policy. Moreover, there is at least some evidence in the record to support the trial court's finding that, at the time that Presnell's execution order was issued, the DOC's "modified" normal and legal visitation procedures "continue[d] to impose significant limitations on visitation."

With respect to the third condition, the Agreement states that "[the Attorney General's] office will not pursue an execution warrant from the District Attorney in the below defined cases before . . . a vaccination against COVID19 is readily available *to all members of the public.*" (Emphasis supplied.) The State argues that multiple FDA-approved vaccines have been "widely available" since the winter of 2020 and that the trial court's "extreme interpretation" of the term "all members of the public" as including children under five years of age is contrary to the "substantial compliance" rule.[19]

---

[19] The State also argues that whether this condition was satisfied should have no bearing in Presnell's case, claiming that "[he] is not eligible to be in the presence of children because of his convictions." The State does not explain the basis for this assertion, nor did the State present any evidence below to

77

However, the Agreement's plain language, drafted by the State, places no limitation on the age of who is considered a member of the public. Furthermore, whatever the availability of a COVID-19 vaccine in the winter of 2020, that level of availability could not have been what the parties intended as satisfying the third condition of the Agreement, given the fact that the parties entered the Agreement on April 14, 2021, well over three months after that level of availability had already been attained.

Moreover and most significantly, as the trial court correctly pointed out, the State's "substantial compliance" argument ignores a fundamental part of the Agreement — that the State was to provide six months' notice after all three conditions were met before seeking an execution order. It is well established that, "if the parties

support it. Moreover, pretermitting the relevance of the State's assertion generally, the Appellees argued in the trial court that the fact that no vaccine was available to children under the age of five years not only led the DOC to prohibit visitors in that age group to the prisons, thereby preventing execution-eligible inmates from visiting with affected family members, but they also argued and presented supporting evidence that this age limitation hindered capital defenders with children in this age group, including Presnell's counsel, in representing their clients because of a fear of transmitting the virus to their children.

*expressly agree that time* shall be important; if they stipulate that a thing shall be done or not done, at a given time, then *time* is of the essence of the contract, and it must be observed." *Sneed v. Wiggins*, 3 Ga. 94, 102 (1847) (emphasis in original). See *Piedmont Center 15, LLC v. Aquent, Inc.*, 286 Ga. App. 673, 676 (649 SE2d 733) (2007) (relying on *Sneed* to conclude that time was of the essence in a lease's cancellation provision and that the parties therefore had to strictly comply with the provision). Cf. *Electronic Data Systems Corp. v. Heinemann*, 268 Ga. 755, 757 (4) (493 SE2d 132) (1997) (stating that "[t]he courts should hesitate to rewrite private contracts" to toll time limits).

The State does not argue that it substantially complied with this six-month notice provision, and the undisputed evidence shows that the Appellees did not receive their bargained-for notice in order to adequately prepare for Presnell's clemency proceedings. "One party may not render a performance or give a consideration which is materially different, and still substantially comply with those contract terms generally." *Dennard*, 250 Ga. at 333 (1) n.2.

79

Accordingly, we conclude that the trial court did not abuse its discretion in rejecting the State's "substantial compliance" argument and instead concluding that the Appellees had shown a substantial likelihood of succeeding on the merits of their breach of contract claim. Compare id. at 333 (1) (holding that the appellee substantially complied with the contract where "[t]he additional consideration which [the appellant] receive[d] d[id] not materially alter the consideration for which her predecessor bargained" and she therefore "suffer[ed] no damage" but rather "gain[ed] a monetary benefit"), with *Lager's, LLC v. Palace Laundry, Inc.*, 247 Ga. App. 260, 262 (1) (543 SE2d 773) (2000) (rejecting the appellant's argument that it "substantially complied" with the early termination procedure in the parties' contract by orally complaining and later cancelling the contract by letter because the appellant did not comply with "the contract's unambiguous notice provision" to provide the vendor with a written complaint stating the nature of the deficiencies and an opportunity to cure them).

(d) In addition to the factors ordinarily considered in whether

80

to grant an interlocutory injunction, the trial court addressed and rejected three additional arguments that the State raised below as to why an interlocutory injunction should not be granted, which the State now argues was error. We disagree as to each.

(i) The State argues that the grant of an interlocutory injunction was improper because the relief that the Appellees sought involved the undoing of a past act, namely, the undoing of the issuance of Presnell's execution order. See *Lue v. Eady*, 297 Ga. 321, 333 (3) (d) (773 SE2d 679) (2015) ("Injunctive relief . . . does not provide a remedy for acts already completed."). The trial court properly rejected this argument, ruling that the interlocutory injunction "would enjoin only [the State's] future actions in furtherance of th[e execution order in Presnell's case], including taking further steps to carry out the execution of Mr. Presnell."

(ii) The State also argues that it is not able to provide the relief that the Appellees sought. In support, the State correctly points out that an execution order may only be requested from and granted by the superior court of the county in which an inmate's death penalty

81

case was tried, see OCGA § 17-10-40 (a), and that the district attorney is the only party authorized to represent the State in all criminal cases in the superior court, see *McLaughlin v. Payne*, 295 Ga. 609, 612 (761 SE2d 289) (2014) ("Under our State Constitution, '[i]t shall be the duty of the district attorney to represent the state in all criminal cases in the superior court of such district attorney's circuit. . . .'" (quoting Ga. Const. of 1983, Art. VI, Sec. VIII, Par. I (d)). Therefore, the State contends that the district attorneys in the cases of the inmates affected by the Agreement are the only parties legally able to obtain the execution orders in those cases and that, because those district attorneys are not parties to this litigation, the Appellees' request to enjoin the State from pursuing an act that only the district attorneys may perform is "absurd."

Both the law and the evidence presented at the hearing show that the Attorney General is heavily involved in death penalty cases, including the execution process. See OCGA § 17-10-33 (providing that, when a defendant is sentenced to death, a certified copy of the sentence is sent to the Attorney General); OCGA § 17-10-40 (a)

82

(providing that a certified copy of an order fixing a new time period for the execution of a death sentence must be "sent immediately" to the Attorney General); OCGA § 45-15-3 (5) (providing that the Attorney General "represent[s] the state in all capital felony actions before [this] Court"); OCGA § 9-14-45 (providing that, if a habeas petitioner is being detained under the custody of the DOC, a copy of the petition must be served on the Attorney General). And, in fact, the evidence showed that Graham initiated the process for obtaining the execution order for Presnell by requesting that the district attorney obtain the order. In addition, the evidence presented below included the current version of Georgia's written protocol for lethal injections, which was adopted on July 17, 2012. The protocol sets out a detailed procedure for executing a condemned inmate. According to that protocol, the last step in the "Preparation of the Condemned" before the actual execution itself begins requires that "[t]he Attorney General, or the Attorney General's designee, shall advise the [DOC] Commissioner as to whether or not to proceed" with the execution. Ga. Dept. of Corrections, Ga. Diagnostic and

83

Classification Prison, Lethal Injection Procedures, II (D) (10). Accordingly, the record supports the trial court's finding that "the Attorney General's office is so ingrained in Georgia's process of carrying out executions that the proposed injunction would, as a practical matter, prevent the issuance of execution warrants for prisoners who fall in the scope of the Agreement until the terms of that Agreement are met."

(iii) In the last of the three additional arguments, the State argues that, before the interlocutory injunction issued, district attorneys were authorized to seek execution orders for execution-eligible death row inmates and the DOC was authorized to effectuate such orders. However, the State contends that this is no longer the case and that, therefore, the interlocutory injunction interrupted the status quo.

As the trial court correctly stated, the interlocutory injunction does not prevent a district attorney from acting alone to obtain an execution order. Instead, as the trial court explained in its order, the injunction prevents the defendant parties to this action, namely, the

84

Attorney General and the State of Georgia, which includes "its subordinate departments and employees," "from having any involvement in th[e execution] process or from initiating any execution contrary to the terms of the Agreement, even if a district attorney did act by himself or herself to obtain a warrant." Accordingly, the trial court properly determined that the interlocutory injunction would protect and maintain the status quo "by returning the parties to their positions before [the State's alleged] breach." See *Byelick*, 275 Ga. at 506 (1) (holding that the status quo that warranted protection by an interlocutory injunction was the position that the parties were in prior to the time that the plaintiff's breach of contract claim arose).

(e) Finally, the State argues that the interlocutory injunction is "impractical and onerous" on the DOC, who cannot comply with execution orders until it changes its visitation policies, and on parties who are not even bound by the Agreement, including district attorneys who might otherwise seek execution orders. However, the interlocutory injunction issued by the trial court properly restrained

85

Defendants State of Georgia and Christopher M. Carr, in his official capacity as Attorney General of the State of Georgia, and anyone acting in active participation or concert with them . . . from (1) pursuing any execution warrant for death-eligible prisoners, other than Billy Raulerson, whose petitions for rehearing before the Eleventh Circuit were denied during the statewide judicial emergency or (2) taking any action in furtherance of any previously issued execution warrant for any such death-eligible prisoners identified above including the warrant issued with respect to Mr. Virgil Presnell, Jr.

See OCGA § 9-11-65 (d) (providing in pertinent part that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, *and upon those persons in active concert or participation with them*" (emphasis supplied)). Therefore, the interlocutory injunction affects the State "no more than necessary to preserve the status quo and protect [the Appellees] from the threatened harm." *Grossi Consulting, LLC v. Sterling Currency Group, LLC*, 290 Ga. 386, 389 (2) (722 SE2d 44) (2012). And we conclude that "the injunction is not overly broad, but is tailored to the facts and law of this case." *Bd. of Commrs. of Spalding County v. Stewart*, 284 Ga. 573, 575 (3) (668 SE2d 644) (2008).

(f) For all of the reasons discussed above, we conclude that the trial court did not abuse its discretion in granting the Appellees' motion for an interlocutory injunction. See *City of Waycross,* 300 Ga. at 111 (1).

*Judgment affirmed. All the Justices concur, except Peterson, P. J., and Pinson, J., disqualified, and Warren, J., not participating.*

BETHEL, Justice, concurring.

"Wisdom, Justice, and Moderation." Those words are engraved upon the Great Seal of the State of Georgia and are recited when we pledge allegiance to the flag of the State of Georgia.[20] They symbolize the three pillars upon which sound government and our State Constitution rest.

With those principles in mind, I highlight a few facts apparent from the record in this case which are, of course, included in the broader recitation of the record found in the opinion of the Court. A Senior Assistant Attorney General and her supervisor, a Deputy Attorney General, both clearly and unambiguously agreed to a course of conduct related to the function of the Department of Law over which they had supervisory authority. The State now wishes not to follow that agreed-upon course of conduct. This litigation follows.

The Office of the Attorney General *should* have mooted this case before it was filed by simply fulfilling the promises its attorneys

---

[20] See OCGA §§ 50-3-2 and 50-3-30 (c).

made — *even if the State later had reservations* about the binding effect of the words of its Deputy Attorney General and Senior Assistant Attorney General. Instead, the State elected to attempt to avoid honoring the agreement it made.

"Inside every cynical person, there is a disappointed idealist," a comedian once said. But his words are, of course, no laughing matter. Cynicism is an infectious and contagious thing that eats at the fibers of the fabric which hold together human society. Government is often an accidental vector of our society's cynicism. It really should avoid being an intentional one.

Though it may prove inconvenient, uncomfortable, or undesirable to the State, when both a Deputy and a Senior Assistant Attorney General are on record agreeing that the State will do or not do something, absent a showing that those lawyers were engaged in an illegal or unethical endeavor[21] or that honoring the agreement

---

[21] There has been no suggestion by the State of impropriety of this sort. Nor has there been a suggestion that the agreement here was entered into against the wishes or direction of the Attorney General or other person in the supervisory chain.

will incur an unauthorized cost to the State, *everyone* should be able to count on the State to honor its word. Not because it entered a contract that waived sovereign immunity. Not because the party asking the State to do as it said it would was sufficiently copied on an electronic communication message or was a third-party beneficiary. Not because the author of a message followed the correct electronic "pinky swear" that is necessary to transform a statement into a binding commitment. Rather, the State should keep its promises because The People of Georgia, who are the very source of the State's sovereignty, are owed a government that honors its commitments.

In a society governed by the rule of law, courts must entertain lawfully filed cases and vindicate rights of parties, as defined by the law. And if the law allowed the State to avoid fulfilling the promises it made here, this Court would be bound to allow that. For the reasons explained in the opinion of the Court, however, the law thankfully does not allow that avoidance here. It's a shame anyone thought it appropriate to ask.

I am authorized to state that Chief Justice Boggs, and Justice Ellington, Justice McMillian, Justice LaGrua, and Justice Colvin join in this concurrence.

Decided December 20, 2022.

Murder. Fulton Superior Court. Before Judge Williams.

*Christopher M. Carr, Attorney General, Julie A. Jacobs, Patricia B. Attaway Burton, Deputy Attorneys General, Sabrina D. Graham, Brooke Heinz-Chaplain, Logan B. Winkles, Senior Assistant Attorneys General, Jonathan D. Loegel, Assistant Attorney General*, for appellants.

*Caplan Cobb, Michael A. Caplan, Julia B. Stone, Cameron B. Roberts; Bondurant Mixson & Elmore, Michael B. Terry, Ronan P. Doherty; Eversheds Sutherland, John H. Fleming, Ann G. Fort; Monet A. Brewerton-Palmer, S. Jill Benton*, for appellees.

*Patrick Mulvaney, Michael B. Admirand, Ryan Primerano*, amici curiae.