**FIRST DIVISION**
**BROWN, C. J.,**
**BARNES, P. J., and RICKMAN, P. J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**November 3, 2025**

# In the Court of Appeals of Georgia

A25A1177. GARREN et al. v. BRYANT.

BROWN, Judge.

Joann Bryant, the mother of decedent Larry Burden, who died while he was an inmate at the Harris County Correctional Institute (hereinafter the "prison" or "HCP"), filed a wrongful death action against Crystal Garren, Daniel Maddox, Donald Walker, Jeremy McDowell, Noel Flowers, Troy Moore, and Donald Barber (collectively "Defendants"), all of whom were employed as correction officers at the prison at the time of the decedent's death. Defendants appeal from the trial court's denial of their motion to dismiss Bryant's action, arguing that they are entitled to official immunity. For the reasons below, we affirm in part and reverse in part.

A motion to dismiss asserting official immunity is based upon the trial court's lack of subject matter jurisdiction. See OCGA § 9-11-12 (b) (1). When a defendant asserts such a motion, "the trial court may hear evidence and make relevant factual findings to decide the threshold issue." *Rivera v. Washington*, 298 Ga. 770, 778 (784 SE2d 775) (2016). In doing so, "a trial court is not confined to the allegations of the complaint but is authorized to hear the matter on affidavits presented by the respective parties, or to direct that the matter be heard wholly or partly on oral testimony or depositions." (Citation and punctuation omitted.) *State of Ga. v. Federal Defender Program*, 315 Ga. 319, 327 (3) (882 SE2d 257) (2022). "We review de novo a trial court's ruling on a motion to dismiss based on official immunity grounds, which is a matter of law. However, factual findings by the trial court in support of its legal decision are sustained if there is any evidence authorizing them, and the burden of proof is on the party seeking the waiver of immunity." (Citation and punctuation omitted.) *Campbell v. Cirrus Educ., Inc.*, 355 Ga. App. 637, 645 (3) (845 SE2d 384) (2020).

The record shows that at the pertinent time, HCP, a minimum security prison, housed approximately 50 inmates in each of its three dormitories. In the early morning

hours of November 1, 2015, defendant Barber, who was the officer in charge of the night shift, was conducting walk-through checks of the dormitories when Burden complained that he was experiencing chest pain on his right side and asked for a medical request form. Defendant Barber gave Burden the form, upon which Burden wrote that he had been incarcerated for 30 months and was having chest pains. Defendant Barber completed an incident report, noting Burden's complaint and stating that he notified his supervisor, defendant Garren, who told him to keep a close eye on Burden, have him fill out the form, and to notify the next shift of the incident. Defendant Barber checked on Burden again, who told him his pain "comes and goes," and Barber instructed him to let them know if it got any worse. Defendant Garren deposed that she instructed defendant Barber "to make contact with medical," but defendant Barber deposed that he was never given that instruction. When defendant Barber completed his shift, he went on vacation and did not return to HCP until after Burden's death.

More than 24 hours later, on November 2, Burden was examined by the prison nurse. The nurse listed "heartburn" as Burden's complaint, making no reference to chest pain, but she noted that his complaint had lasted six months and referred to it

3

as a chronic problem. The nurse recorded normal vitals, diagnosed Burden with heartburn, and gave him antacid tablets. On November 3, Burden was seen by an unknown physician who noted that Burden's pain started several months ago.[1] The physician ordered an EKG, but there was no evidence that an EKG was ever done or that any further follow up occurred.

Shortly after 11:00 a.m. on November 5, Burden was playing basketball with other inmates in the recreation yard, which was directly in front of the control room, the nerve center of the prison that contained CCTV monitors so officers could observe all areas of the facility. At that time, no officers were physically present in the yard, but defendants Moore and Walker were in the control room. Defendant Walker was training defendant Moore, who had begun working at the prison four days earlier. The control room also housed an automated external defibrillator ("AED").

Around 11:37 to 11:39 a.m., Burden collapsed and other inmates notified the officers by banging on the control room windows. Defendant Moore responded first, followed by defendant Maddox, who was the officer in charge that day and knew from

---

[1] Because the medical record is not entirely legible, we cannot discern whether it says that Burden stated that his chest pains started either "80" or "30" months ago.

4

defendant Barber that Burden had complained of chest pains.[2] Defendant Moore started moving inmates off the yard while defendant Maddox attended to Burden. Burden was taking deep breaths and was unresponsive to defendant Maddox's verbal commands. At 11:39 a.m., defendant Maddox radioed his supervisor, defendant Garren, who arrived along with the prison counselor and defendant Flowers. Defendant Flowers called 911 and retrieved a handheld video camera from the control room to record the incident. Defendant Walker, who had former combat training, went to the yard to assist while defendant McDowell took over for him in the control room.

Burden stopped breathing, and at approximately 11:42 a.m., the prison counselor and defendant Walker started to perform cardiopulmonary resuscitation (CPR), including chest compressions and mouth-to-mouth breathing. EMS was called at 11:41 a.m., arrived at 11:45 a.m., and departed with Burden at 11:51 a.m. No medical personnel were present at the prison when Burden collapsed. Burden was pronounced dead at the hospital at 12:29 p.m. His cause of death was later determined to be cardiac

---

[2] Defendant Maddox deposed that defendant Barber told him that the medical staff had been notified about Burden's complaint.

dysrhythmia (irregular heartbeat) with cardiomegaly (enlarged heart) and myocardial fibrosis.

Bryant filed a wrongful death action against Defendants in federal court. Following the federal district court's remand of Bryant's state law claims, Bryant filed a renewal complaint in the Superior Court of Muscogee County. In the complaint, Bryant alleged Defendants were negligent in their performance of a number of ministerial acts that arose out of the standard operating procedures ("SOPs") of the Georgia Department of Corrections ("GDOC"). In her complaint, Bryant references SOPs VH31-0001 ("Urgent/Emergent Care Services"), VH31-0005 ("Evaluation Services for Urgent or Emergent Health Care Requests") , both of which expressly apply to county prisons, and VH31-0006 ("Urgent/Emergent Care Equipment and Supplies") , which does not expressly apply to county prisons but is referenced in VH31-0001.

In pertinent part, VH31-0001 provided as follows:

Section (VI) (B) (2) (a). All correctional officers will receive training in first aid, and standard precautions. Officers will be trained in BLS [basic life support, (i.e., cardiopulmonary resuscitation)] and the use of an AED as a part of Basic Correctional Officer Training (BCOT). Correctional

6

officers will be re-trained every year in BLS and the use of an AED. First aid will be reviewed annually.

Section (VI) (E) (2) (a). When a medical emergency occurs outside of the medical unit, the correctional officer will immediately notify health care personnel. (b). The first responder will provide immediate first aid measures. Health care personnel will respond to the emergency immediately with the emergency response bag, portable oxygen and an AED.

VH31-0005 provides, in pertinent part,

Section (VI) (A) (2). The initial response of correctional personnel to urgent or emergent medical requests may include First Aid, CPR, defibrillation with an [AED] when indicated, and immediate notification of health care personnel. In the event of CPR in progress and if the AED is used, 911 should also be notified immediately.

Section (VI) (A) (4). Correctional personnel will have the authority to decide the most appropriate choice of action in response to a medical emergency including: (a) Direct call to "911" services in the event of a life-threatening emergency. (e.g., cardiac arrest, uncontrolled bleeding.) (b) Direct call to Medical Personnel in the event of a serious medical problem. (Chest pain, difficulty breathing, seizures, unconsciousness.) (c) Notification of their supervisor about inmate/probationers with medical emergencies or serious medical problems after they have contacted the medical staff.

Section (VI) (C) (1). When an inmate/probationer presents with an urgent/emergent complaint when health care staff are not at the facility, correctional staff will contact the on-call provider who will triage the . . . complaint via telephone.

Finally, VH31-0006, Section (VI) (E) (2) states: "[a]ll emergency equipment will be checked by each shift on a daily basis to ensure that the equipment is working properly and ready for use."

Defendants filed a motion to dismiss the complaint pursuant to OCGA § 9-11-12 (b) (1), asserting a lack of subject matter jurisdiction due to the doctrine of official immunity and maintaining that the duties allegedly violated were discretionary rather than ministerial. The trial court denied the motion, finding that Defendants violated three ministerial duties: (1) they did not immediately notify medical personnel when Burden reported chest pain; (2) they did not utilize the AED when Burden stopped breathing and became unresponsive; and (3) they did not check the AED every shift to ensure that it was working and ready for use. The trial court issued a certificate of immediate review, and this Court granted Defendants' ensuing application. This appeal followed, in which Defendants argue that the trial court erred in failing to conduct individualized assessments of each officer's entitlement to official immunity,

in denying official immunity to the officers who responded to Burden's collapse, and in denying official immunity to defendants Barber and Garren regarding their handling of Burden's complaints of chest pain.

> The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity. Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure.

(Citations and punctuation omitted.) *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001). "[Official] immunity is an entitlement not to stand trial rather than a mere defense to liability." (Citation omitted.) *Rivera*, 298 Ga. at 776. "Because the rationale for [official] immunity is to protect the independent judgment of public employees without the potential threat of liability, . . . a court must consider as a threshold issue whether the officer is entitled to [official] immunity from personal liability in a lawsuit for damages." *Cameron*, 274 Ga. at 122.

In this case where there are no allegations of actual malice or intent to cause injury, the determination of whether official immunity bars the suit turns on the issue of whether the defendants' actions were discretionary or ministerial.

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed. (Citation and punctuation omitted.) *Austin v. Clark*, 294 Ga. 773, 774 (755 SE2d 796) (2014). "[T]he determination of whether the action at issue is discretionary or ministerial is made on a case-by-case basis, and the dispositive issue is the character of the specific actions complained of, not the general nature of the job." *Barnett v. Caldwell*, 302 Ga. 845, 848 (II) (809 SE2d 813) (2018).

> Even in the context of functions that are typically discretionary, a written (or unwritten) policy, a supervisor's specific directive, or a statute may establish a ministerial duty — but only if the directives are so clear, definite, and certain as to merely require the execution of a specific, simple, absolute, and definite duty, task, or action in a specified situation without any exercise of discretion.

*Id.* When the trial court conducts the fact-specific analysis required to address the ministerial/discretionary dichotomy that governs whether official immunity applies and finds evidence that a ministerial duty existed, it is not authorized to dismiss the action. *See generally Austin*, 294 Ga. at 774-775 (dismissal of action reversed where the factual evidence of a potential ministerial duty may exist but had not yet been developed).

1. Defendants argue that the trial court erred when it denied defendants Barber and Garren official immunity because it determined that the duty to notify medical personnel when Burden first complained of chest pains was a ministerial one. Defendants maintain that the SOP regarding urgent/health care services did not impose ministerial duties and that supervising inmates is a discretionary function. We disagree.

It is undisputed that the officers at HCP underwent BCOT provided by the GDOC. Although the defendants concede that some SOPs are applicable to county correctional institutes, they also rely on witness testimony that GDOC did not train the officers, presumably insinuating that the SOPs did not apply here. However,

VH31-0001 and VH31-0005, on their face, expressly applied to county prisons, and there was direct testimony that the SOPs applied to the prison correction officers.

Section (VI) (E) (2) (a) of SOP VH 31-0001 expressly states "[w]hen a medical emergency occurs outside of the medical unit, the correctional officer *will* immediately notify health care personnel." (Emphasis added.) Section (VI) (J) (1) (b) of VH 31-0001, which also expressly applied to county prisons, provided: "In serious/life threatening situations, the local EMS will be notified (e.g., chest pain, acute asthma, difficulty breathing, loss of consciousness) for transport of the patient to the local hospital for stabilization. (Emphasis omitted)." On its face, it includes chest pain as an example of a serious/life threatening situation. Section (VI) (A) (4) of SOP VH 31-0005 gives correctional personnel authority to decide the most appropriate of three choices of action in urgent health care matters, all of which required notification of medical staff.[3] Section (VI ) (C) (1) of this SOP provides: "When an inmate/probationer presents with an urgent/emergent complaint when health care

---

[3] The choices included calling 911 in the event of a life-threatening event such as cardiac arrest or uncontrolled bleeding, calling medical personnel in the event of a serious medical problem, such as chest pain, and notification of their supervisor about and inmate's medical emergency *after* contacting medical staff.

12

staff are not at the facility, correctional staff *will* contact the on-call provider who will triage the . . . complaint via telephone." (Emphasis added.)

Defendants argue that the SOPs imposed discretionary duties because they did not define "medical emergency," but the failure to explicitly define "medical emergency" is inconsequential. Here, the SOPs explicitly used chest pain as an example of a serious/life threatening emergency that required personnel to notify local EMS and as an example of a serious medical problem that required a direct call to medical personnel. The cases Defendants rely on, *Grammens v. Dollar*, 287 Ga. 618, 620-621 (697 SE2d 775) (2010) and *Barnett*, supra, do not demand a result in their favor. In those cases, unlike the case at bar, pertinent terms in the policies at play were not defined. In *Grammens*, a student suffered an eye injury during a science experiment that involved launching a two-liter plastic soda bottle by means of water and air pressure and the policy required students to wear eye-protective equipment when participating in or observing instruction involving caustic or explosive material, but it failed to define explosive material. See id. at 618. Our Supreme Court held that "[b]ecause the eye-protection policy required the teacher to perform a discretionary act to determine if the policy was applicable, the policy did not impose a ministerial

duty." Id. at 621. In *Barnett*, supra, a student died after engaging in horseplay in the classroom while the teacher was outside of the classroom. *Barnett*, 302 Ga. at 845. The school policy at issue stated: "The classroom teacher is solely responsible for the supervision of any student in his or her classroom. Students are never to be left in the classroom unsupervised by an APS certified employee[,]" id. at 846-847 (I), but neither "supervision" nor "unsupervised" was defined, and the principal acknowledged that there were emergent situations in which a teacher could leave the classroom. See id. at 849 (I). The Court found that the policy "[o]ffer[ed] no specificity in the general duty of student supervision, [and therefore could not] be read to require an absolute or definite duty[.]" Id. at 849 (II).

Defendants cite *Graham v. Cobb County*, 316 Ga. App. 738 (730 SE2d 439) (2012) for the proposition that when the supervision of inmates involves the provision of medical care, the duty is discretionary. But in *Graham*, supra, where an inmate died from liver failure and plaintiff alleged that the officers provided inadequate medical care, we explained therein that "the *provision of adequate medical attention is a ministerial act* . . . [and] is not subject to official immunity." (Citation and punctuation omitted; emphasis added.) Id. at 742-743 (1) (b) (ii). We also explained that "the

14

determination of what medical treatment to provide is an act of discretion subject to official immunity." (Citation and punctuation omitted; emphasis omitted.) Id. at 742-743 (1) (b) (ii). Here, the issue is that when Burden initially made his complaint, no medical attention was provided immediately. Burden was not seen by medical staff until 27 hours later. The SOPs definitively stated that medical staff "will" be called immediately, as opposed to "may" or "should." See *Polk County v. Ellington*, 306 Ga. App. 193, 199-202 (2) (a) (702 SE2d 17) (2010) (paramedics who misdiagnosed an illness immune from suit because written policies, referring to what they "may" or "should" do, left them some discretion in how to implement them), disapproved on other grounds, *City of Roswell v. Hernandez-Flores*, 373 Ga. App. 436, 439 (908 SE2d 694) (2024). While Defendants also rely on cases that state the general proposition that "supervising inmates" is discretionary,[4] that rule is inapposite here, as this case does not involve allegations about the general supervision of inmates.

---

[4] See *Parish v. State*, 270 Ga. 878, 879-880 (514 SE2d 834) (1999) (supervision of convicts on work detail is a discretionary duty, as it requires the exercise of discretion); *Merrow v. Hawkins*, 266 Ga. 390 (467 SE2d 336) (1996) (jailer who gave an inmate his car to wash was exercising a discretionary power); *Dept. of Corrections v. Lamaine*, 233 Ga. App. 271 (502 SE2d 766) (1988) (GDOC and probation officer officially immune from wrongful death action wherein a probationer struck and killed someone).

Bryant cites *Melton v. McCarthan*, 356 Ga. App. 676 (848 SE2d 684) (2020), which was before us on the denial of summary judgment, and is somewhat instructive here. In that case, the plaintiff was injured while incarcerated when he was attacked twice by another inmate. Id. at 676. After the first attack, an officer forcibly removed the perpetrator from the cell but did not complete an incident report. Id. Later that day, the same perpetrator was placed back into the cell with the plaintiff inmate by a different officer who had no knowledge of the earlier attack, and the plaintiff inmate was violently attacked. Id. The plaintiff in that case alleged the violation of policies that provided that: (1) incidents resulting in physical harm or threaten the safety of any person must be documented in an incident report and submitted to a supervisor; (2) incidents involving use of force must be recorded to establish identities of the staff, inmates or others involved and to describe the incident; see id. at 677-678 (1); and (3) the oncoming watch commander must arrive in sufficient time to review prior events and advise employees of possible hazardous situations from prior shifts. See id. at 678-679 (2). The operative term in that case was "must," rather than "will," but both terms denote mandatory rather than optional. In light of the policies, we held that the duty to create an incident report was ministerial, and therefore, the first officer was

16

not immune from suit. Id. at 678 (1). However, the second officer was immune from suit because he lacked knowledge of the initial incident and therefore breached no ministerial duty. Id. at 679 (2).

Here, Burden's complaint of chest pain triggered the duty to alert medical staff under the SOPs provided above. Although a dispute of fact exists as to whether defendant Barber was told to alert medical, as his deposition testimony conflicts with defendant Garren's on that point, there is no dispute that no medical professional saw Burden until almost 27 hours later. As the SOPs required immediate contact of medical personnel in the event of a complaint of chest pain, this duty was ministerial and required no exercise of deliberation. Accordingly, neither defendant Barber nor defendant Garren were entitled to official immunity on this claim.

2. Defendants argue that they cannot be held liable for failing to obtain and utilize the AED when Burden collapsed because the decision was a purely discretionary one. We disagree with respect to defendants Garren, Flowers, McDowell, Walker, and Maddox, but we agree that defendant Moore is immune from suit.

17

As stated earlier, the prison had an AED in the control room. All of the officers on duty except defendant Moore, who was a cadet in training at the time of Burden's death, had received training on how to use the AED. BCOT included how to use an AED, as well as the officers' annual in-service training. Thus, all of the officers, with the exception of defendant Moore, were qualified to use a defibrillator when Burden collapsed.

As stated earlier, VH31-0005 (VI) (A) (2) explained that

[t]he initial response of correctional personnel to urgent or emergent medical requests may include First Aid, CPR, defibrillation with an Automated External Defibrillator (AED) when indicated, and immediate notification of health care personnel. In the event of CPR in progress and if the AED is used, 911 should also be notified immediately.

Because this SOP uses the term "may," in accordance with *Ellington*, supra, it supports Defendants' arguments that it imposed a discretionary duty. However, Bryant points out that this SOP was not the only basis for the claim and reminds this Court that a ministerial duty may also be established by evidence of an unwritten policy or a supervisor's specific directive that clearly requires the execution of a

specific action. See *Barnett*, 302 Ga. at 848 (II); *Wilson v. Anderson*, 374 Ga. App. 668, 670 (1) (913 SE2d 813) (2025).

GDOC's statewide medical director deposed that correctional officers receive training so that if no health care personnel are present when confronted with such an emergency, the officers respond, and according to her testimony, the policy required them to take the aforesaid equipment to the scene. Additionally, according to GDOC's in-service training witness, GDOC officers are trained that if a person stops breathing and does not respond when the officer taps him, then the officer should immediately call for someone to get an AED. "[W]hen a governmental department creates its own policy requiring certain actions under certain situations, then the actors for that department have a ministerial duty to follow the policy. Obedience of the departmental policy is ministerial." (Citation and punctuation omitted.) *Standard v. Hobbs*, 263 Ga. App. 873, 876 (1) (589 SE2d 634) (2003). See also *Lincoln County v. Edmond*, 231 Ga. App. 871, 875 (2) (501 SE2d 38) (1998) (no immunity where county road superintendent did not comply with county policy to remove a fallen tree from the roadway although there were elements of discretion in how it was moved). None of the corrections officers on duty at the prison on November 5, 2015, brought

a medical response bag or retrieved the AED for use on Burden after he stopped breathing.

Defendant Maddox deposed that at the time of Burden's death, he did not know where the AED was located, although he had seen it before, and did not know if it was operable. Defendant Walker deposed that at the time of Burden's death, the AED was on site but no one attempted to retrieve it when Burden collapsed, and that he did not think the AED crossed anyone's mind. Ultimately, it was discovered that the AED was inoperable on that day because its batteries were dead and would not hold a charge.[5]

Again, when the trial court determines the jurisdictional issue of subject matter jurisdiction in a motion to dismiss based on immunity, we review its determination under the any evidence rule. See *Bd. of Regents of Univ. System of Ga. v. Brooks*, 324 Ga. App. 15, 16, n.2 (749 SE2d 23) (2013). Here, there was evidence of a directive to obtain an AED if an inmate stopped breathing via the deposition testimony of the in-service training witness, which supported the trial court's finding that the retrieval

---

[5] Shortly after Burden's death, the warden learned that the AED was inoperable during the incident, and the warden personally confirmed that the battery was dead and would not charge.

and use of the AED was ministerial. Accordingly, defendants Garren, McDowell, Walker, Maddox, and Flowers, all of whom received the training discussed above, were not officially immune from suit. Defendant Moore, however, who was a cadet and had not been through BCOT or the annual in-service training as he started working at HCP only four days before Burden's death, was immune, as there was no evidence offered that he was aware of the written or unwritten policy.

Defendants argue that even if there were a ministerial duty to check the operability of the AED, there was still discretion in the decision to use it. This argument fails, as discussed above. Regarding the duty to check the AED, GDOC SOP VH31-0006, which covered equipment and supplies used in urgent/emergent cases, did not include county prisons in its "Applicability" section, but VH31-0001 (VI) (D), which did expressly apply to county prisons required that emergency equipment and supplies be maintained in accordance with VH31-0006. VH31-0006 (VI) (E) (2) required all emergency equipment be checked by each shift on a daily basis to ensure that it worked properly and was ready for use. Additionally, there was testimony from the warden, although disputed by several of the officers , that he issued a written directive for the officer in charge in the control room to check the AED on each shift.

And as stated earlier, a supervisor's directive may establish a ministerial duty. See *Barnett*, 302 Ga. at 848 (II). There was no evidence offered that the correctional officers routinely checked the AED before Burden's death. Rather, Defendants deposed that the requirement to do so was imposed after Burden's death. Accordingly, the trial court did not err in concluding that the officers were not entitled to official immunity as to this claim.

3. Defendants argue that the trial court erred by failing to conduct an individualized assessment of each officer's entitlement to official immunity. As already referenced, we agree with respect to defendant Moore, who, as a new cadet in the prison, had no knowledge of the standard operating procedures or other evidence that served as the basis for the trial court's finding that ministerial duties existed. See *Melton*, 356 Ga. App. at 679 (2) (officer who had no knowledge of a prior violent incident was immune from suit).

*Judgment affirmed in part, reversed in part. Barnes, P. J., concurs fully. Rickman, P. J., concurs in Divisions 1 and 3, and dissents in Division 2.*

A25A1177. GARREN et al. v. BRYANT.

RICKMAN, Presiding Judge, concurring in part and dissenting in part.

I concur in Divisions 1 and 3 of the majority opinion. However, I respectfully dissent to Division 2 because in neither the relevant written policy nor the testimony cited by the majority can I see a policy that is so clear, definite, and certain that there was a ministerial duty for the corrections officers to bring and use an AED device without any exercise of discretion.

As our Supreme Court explained in *Barnett v. Caldwell*, 302 Ga. 845 (809 SE2d 813) (2018),

> [e]ven in the context of functions that are typically discretionary, a written (or unwritten) policy, a supervisor's specific directive, or a statute may establish a ministerial duty — but only if the directives are so clear, definite, and certain as to merely require the execution of a

specific, simple, absolute, and definite duty, task, or action in a specified situation without any exercise of discretion.

*Barnett*, 302 Ga. at 848 (II).

> Standard operating procedure ("SOP") VH31-0005 (VI) (A) (2) provides that

> [t]he initial response of correctional personnel to urgent or emergent medical requests may include First Aid, CPR, defibrillation with an Automated External Defibrillator (AED) when indicated, and immediate notification of health care personnel. In the event of CPR in progress and if the AED is used, 911 should also be notified immediately.

As the majority points out, because this SOP uses the term "may," it supports the appellants' arguments that it imposed a discretionary duty.

VH31-0005 (VI) (B) (2) provides that "[i]f the situation is a potentially life threatening medical emergency (e.g. cardiac arrest, chest pain, seizure, difficulty breathing, severe bleeding and unconsciousness), *health care personnel* will respond to the site immediately. The medical response bag, portable oxygen, AED, and a stretcher should be taken to the location." (Emphasis supplied.) The Georgia Department of Corrections' ("GDOC") statewide medical director testified in a deposition that if no health care personnel were on the premises at the time of a potentially life-threatening medical emergency, correctional officers would respond.

She was asked if it was correct that "the correctional officers would be bringing with them, to the extent they have one, the response bag, a portable oxygen, an AED, and a stretcher — should be taken to the location." She replied, "The policy states yes." The majority refers to this testimony, stating that "according to her testimony, the policy required them to take the aforesaid equipment to the scene." However, the medical director's testimony appears to be a misreading of VH31-0005 (VI) (B) (2), which applies only to health care personnel. Furthermore, the medical director was later asked "if the correctional officers were to comply with this particular GDC policy, they are required to bring an AED to the site; correct?" She answered, "That's not what the policy says." Consequently, I do not believe that the medical director's testimony shows that VH31-0005 (VI) (B) (2) establishes a ministerial duty for correctional officers regarding AEDs. See *Barnett*, 302 Ga. at 849 (II).

The majority cites deposition testimony of GDOC's in-service training witness as support for the trial court's finding that the retrieval and use of the AED was ministerial. The in-service training witness testified that GDOC correctional officers are trained to call for an AED "once they have arrived on scene, . . . they have determined scene safety, they determined that the scene is safe, they have checked the individual, and the individual is not breathing." After the officers have determined

3

that the individual is not breathing and is unresponsive, they would tap the individual and ask, "Are you okay? Are you okay?" If there is no response, and the officers do not see any visible breathing after they look for five seconds, then they "would call for someone to get an AED." Specifically, the officers "would call for medical via radio, and medical would bring the AED." If medical personnel are not available, the witness testified that "[w]henever [the officers] call for help, then that would be determined by the shift supervisor. They could get the AED while responding to the incident."

I believe that the training that GDOC correctional officers receive regarding when to call for someone to get an AED, as described by the in-service training witness's testimony, allows the officers to use discretion to determine whether someone is breathing. In addition, if no medical personnel are available, the testimony was the officers "could" get the AED while responding to the incident. Even assuming that the county correctional officers involved in this case received the same training as GDOC correctional officers, I do not believe that the training is so "clear, definite, and certain in directing [the appellants'] actions that it established a ministerial duty requiring no exercise of discretion whatsoever." *Barnett*, 302 Ga. 849 (II).

4

For these reasons, I would reverse the trial court's denial of the appellants' motion to dismiss as to this claim.